**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

_____

No. 91-7284
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

KENNETH WILLIAMS, ROBERT KITCHENS,
and JACKY GREEN,

Defendants-Appellants.


_____

Appeals from the United States District Court
for the Northern District of Mississippi
_____
(February 24, 1993)

Before POLITZ, Chief Judge, GARWOOD and DAVIS, Circuit Judges.

DAVIS, Circuit Judge:

Kenneth Williams, Robert Kitchens, and Jacky Green appeal their convictions for aiding and abetting the possession with intent to distribute cocaine and crack cocaine and aiding and abetting the use of a firearm in relation to a drug trafficking crime. Defendants argue that the evidence is insufficient to support their convictions, that the jury instructions were flawed, and that newly-discovered evidence entitles them to a new trial. We affirm their convictions on the drug charges but reverse their convictions on the weapons offense because we conclude that the court's jury charge on this count was defective.

I.

On September 5, 1990, police officers executed a "no knock" search warrant on a house at 1009 Holmes Street in Greenville, Mississippi. In August, before obtaining the warrant, officers placed the house under surveillance. During the surveillance, police officers observed activity which they concluded was consistent with drug trafficking.

On the night of the search the officers surrounded the house quietly. Two officers stood at the locked back door of the house. Officer Blackley was dispatched under the house to break out the sewer line when the execution of the search warrant began. Five officers waited at the front door with a hydraulic device to get through a steel security door and then enter the house.

With all the officers in place, Officer Hart and Major Ballard used the hydraulic device to open the front steel security door. After quickly opening the metal door, Officers Hart, Morgan, and Zelaya then attempted to break down the inner wood door. They opened the door only a few inches before it was slammed shut.

At the same time, Officer Blackley began breaking open the sewer line under the house. As he broke the pipe, Blackley heard a commotion upstairs and heard someone running through the house. Then he heard the toilet flush. He held a pan underneath the line and caught one package of a white substance wrapped in clear plastic bags. He saw another similar package lodge in the line. He pulled this package out and placed it in the pan as well.

Upstairs, the officers were still attempting to enter the front door. Someone in the house shouted, "Who is it?" The officers responded, "Police officers, open the door." After one to two minutes, the opposition stopped. The officers forced the door open, pushed away a love seat that had been moved against the inner door, and entered the house. The officers found Williams, Kitchens, and Green in the front room of the house. No one else was in the house. No one entered or exited through the back door during the raid.

As the first officer entered the room, he saw Williams move backward and sit on a couch that was across from the door. Kitchens was also moving backward and sat on the opposite end of the same couch. Green was approximately four feet away, standing near a doorway that led to the rest of the house and to the bathroom.

Once the three defendants were secured, the police searched the house. Under a cushion on the couch where Williams was seated, officers found a loaded .25 caliber semi-automatic pistol. This weapon was under the front edge of the cushion, with the handle facing out. The gun was situated so that a person sitting where Williams was found could reach under the cushion and retrieve it.

During the search the officers found several items: a radio scanner with the frequency set on the police band; in the bathroom, a package of single edge safety razor blades and a box of sandwich bags similar to those used in the package recovered from the sewer line; small plastic bags scattered around the floor of the house;

3

and in the kitchen, a bag of white substance that was later determined to be starch, a common cutting agent.

The officers concluded that no one permanently resided in the house. The officers found two stoves in the kitchen, one of which was turned upside down. The other stove was hooked up and had a single pan with food remnants on it. The refrigerator did not function. One bedroom had a bed, dresser, and some clothes on the floor, but no bed linens. The living room had a television, VCR, and some videos. The windows were covered with metal security screens, and both the front and back entrances had metal security doors.

The two packages that were recovered from the sewer line enclosed inner bags which in turn held smaller packages containing individual rocks of crack cocaine and portions of cocaine powder. The sandwich bags used to package the smaller portions were similar to the sandwich bags found in the bathroom and scattered around the house.

Sergeant Elizabeth Hanners, the evidence custodian, collected the evidence. The wet outer packages of the crack and cocaine were discarded, leaving the inner packages and the individually wrapped crack and cocaine. The crack cocaine, including the packaging, weighed approximately 13 grams and included twenty individually wrapped rocks. The cocaine powder, including the six small bags holding the cocaine, weighed approximately 7 grams. Sergeant Hanners field-tested the substances from the sewer line and found

4

that they contained cocaine. The starch found in the kitchen tested negative for the presence of controlled substances.

Hanners sealed the seized items, including the starch, in Greenville Police Department bags and turned them over to the custodian of the Police Department vault. The packages were processed and delivered to the Mississippi Crime Laboratory by certified mail. Pursuant to Crime Lab policy, the drugs were assigned to lab chemist Jon Maddox for analysis. He determined that the substances were cocaine and crack. The starch was tested and found not to contain controlled substances. Maddox removed the packaging and weighed the substances. The cocaine powder weighed 5 grams and the crack cocaine weighed 9.5 grams.

Maddox took a medical leave of absence approximately ten days before trial. During this leave Crime Lab officers investigated complaints that Maddox had pilfered drugs from the lab's disposal pile for his personal use. After this investigation began, drugs that Maddox had previously tested in preparation for his testimony were retested. The state notified defense counsel that the drugs seized in the case would be retested. Crime Lab chemist Ted Chapman reanalyzed the substances and again found that they contained cocaine and crack cocaine. The weight of the drugs before Chapman's analysis, but after Maddox analyzed the drugs and removed the packaging, was 4.2 grams of powder cocaine and 7.8 grams of crack. Neither Maddox nor Chapman tested the purity of the cocaine.

Chapman determined that the third substance, found in the kitchen of 1009 Holmes, was starch. This is commonly used as a cutting agent for cocaine and an ingredient in the cooking process used to convert cocaine powder to crack.

The defendants did not testify at trial. Charles Williams, defendant Kenneth Williams's father, testified that his other son Danny owned the house at 1009 Holmes, but did not live there. The defendants also called Kendall Gibbs, who testified that he rented the house from Danny Williams. Gibbs further testified that he had invited the three appellants to the house for a fish fry and to watch videos on September 5, 1990, and that he left to buy beer, fish, and cigarettes. He left through the back door and did not lock the back metal security door. He stopped at a nearby lounge, where he was informed that police were at his house. Gibbs returned to the house without having purchased the supplies, and police arrested him on an unrelated outstanding misdemeanor warrant.

A jury convicted Williams, Kitchens, and Green of aiding and abetting possession with intent to distribute crack cocaine (Count I) and cocaine (Count II) and aiding and abetting the use and carrying of a firearm during the commission of a drug trafficking crime (Count III). The court sentenced Williams to 144 months of imprisonment and five years of supervised release; the court sentenced both Kitchens and Green to 123 months of imprisonment and five years of supervised release.

Defendants filed motions for a new trial based on newly-discovered evidence about Maddox's removal from his job as a Crime Lab chemist. After a hearing, the district court denied those motions and these appeals followed. The appellants raise three issues on appeal: 1) the evidence was insufficient to support the verdict; 2) the court's jury instructions on the weapon offense was inadequate; 3) the court erred in denying their motion for new trial. We consider these arguments below.

## II.

### A.

Defendants first argue that the evidence is insufficient to support their convictions on all three counts. We consider first their attack on the drug offenses, aiding and abetting each other in possessing with intent to distribute crack cocaine (Count I) and cocaine (Count II).

Possession with intent to distribute cocaine and crack cocaine requires proof that each defendant (1) knowingly (2) possessed cocaine and crack (3) with the intent to distribute it. 21 U.S.C. § 841(a)(1); **United States v. Gallo**, 927 F.2d 815, 821-22 (5th Cir. 1991). To be guilty of aiding and abetting possession of drugs with intent to distribute, each defendant must have aided and abetted both the possession of the drug and the intent to distribute it. **United States v. Lindell**, 881 F.2d 1313, 1322 (5th Cir. 1989), **cert. denied**, 493 U.S. 1087 (1990), **and cert. denied**, 496 U.S. 926 (1990). Defendants need not have actual or constructive possession of the drugs to be guilty of aiding and

7

abetting possession with intent to distribute.  A conviction "merely requires that [defendants'] association and participation with the venture were in a way calculated to bring about that venture's success." **United States v. Salazar**, 958 F.2d 1285, 1292 (5th Cir. 1992), **cert. denied**, 121 L. Ed. 2d 129 (1992).

The "defendant must share in the intent to commit the offense as well as participate in some manner to assist its commission." **United States v. Fischel**, 686 F.2d 1082, 1087 (5th Cir. 1982).  A defendant's mere presence at the scene of the crime does not constitute aiding and abetting; however, the jury may consider presence and association as factors in determining whether the defendant is guilty of aiding and abetting.  **Lindell**, 881 F.2d at 1323.

We review the evidence in the light most favorable to the verdict.  **Glasser v. United States**, 315 U.S. 60 (1942).  We affirm if a rational trier of fact could have found that the evidence establishes the essential elements of the offense beyond a reasonable doubt.  **United States v. Molinar-Apodaca**, 889 F.2d. 1417, 1423 (5th Cir. 1989).

Defendants argue that no reasonable jury could have convicted them of aiding and abetting possession of drugs because the evidence at trial established only that the three were present in a friend's house where drugs were found.

Our review of the record persuades us that the evidence amply supports a finding that all three defendants aided and abetted each other in the possession of the cocaine.  A reasonable jury could

8

have concluded that blocking the officers' entry until the cocaine was disposed of required the concerted effort of all three men. The jury could have inferred that the resistance of two men (Williams and Kitchens) against the door was required to prevent the three police officers from entering. This fact, combined with evidence of their backward motion from the door, permitted the jury to infer that Williams and Kitchens were holding the love seat against the door, while Green flushed the drugs down the toilet. Evidence of the defendants' concerted effort to dispose of the cocaine supports a reasonable inference that all three men both associated and participated in possessing the drugs.

Our inquiry does not end with possession; we must also consider whether the evidence supports a reasonable inference that the defendants aided and abetted each other in distributing the cocaine or intending to do so.

The defendants argue first that the evidence may indicate an intent by them to consume drugs but does not reveal any intent by them to distribute drugs. We disagree. The jury could have determined that the three defendants were unlikely to consume twenty-six individual doses of crack and powder cocaine. Significantly, no evidence was presented at trial that pipes for smoking the crack were found in the house or on the defendants. No hypodermic needles were found. Thus, a reasonable factfinder could have inferred that the defendants were not in the house to consume the drugs.

9

We are persuaded that a reasonable jury could infer that 1009 Holmes was a "crack house," an established outlet for the sale of crack cocaine, and that Williams, Kitchens, and Green were in charge of the business when they were arrested. Police officers testified at trial about the activity at the house in August of 1990, days or weeks before the raid, that led them to believe it was a crack house. Persons visiting the house stopped in front of the house and left their car engines running. Someone inside the house would check the area before allowing the visitors to enter. They stayed inside briefly, and before they left someone surveyed the area to make sure the area was clear. The jury was entitled to believe Officer Hart's testimony that this activity was consistent with drug trafficking.

Viewed most favorably to the verdict, the evidence supports a reasonable inference that the house was not equipped as a full-time residence. There were no bed linens or personal effects; there was no food; the refrigerator did not work. There were only a few items of furniture. The house was secured with metal doors and barred windows. Based on the surveillance, the drug paraphernalia, and the lack of evidence of full-time habitation, the jury was entitled to infer that this was a crack house. **See United States v. Bennett**, 956 F.2d 1476, 1482 (8th Cir. 1992).

A reasonable jury also could infer that the defendants willfully participated in the cocaine distribution enterprise. The three defendants obviously had authority to dispose of the drugs and to prevent access to the house. "Evidence that an individual

10

is 'solely entrusted with a large portion of the proceeds of the drug trafficking enterprise establishes [her] familiarity with, or high level participation in, that enterprise.'" **Salazar**, 958 F.2d at 1295 (alteration in original) (quoting **United States v. Gallo**, 927 F.2d 815, 821 (5th Cir. 1991)).

The paraphernalia found in plain view in the house suggested that cocaine was being distributed. Of course, sandwich bags, single-edge razor blades, starch, and a police scanner do have non-drug-related uses. But the jury was entitled to conclude that none of those other uses suggested by defendants--such as wrapping sandwiches or fish, scraping paint, or ironing shirts--likely took place at 1009 Holmes.

In sum, a reasonable jury could have concluded that 1009 Holmes was a cocaine distribution center under the command and control of Williams, Kitchens, and Green. A jury could infer that the three men necessarily acted in concert to attempt to distribute the drugs. The evidence supports the convictions on Counts I and II.

B.

Appellants argue next that their convictions for aiding and abetting the use of a firearm in relation to a drug offense should be reversed for two reasons. They contend first that the court failed to instruct the jury properly on the requisite intent for this offense and second that the evidence is insufficient to support the verdict. We first consider whether the court properly instructed the jury on this count.

To convict Williams, Kitchens, and Green of aiding and abetting the use of a firearm in relation to a drug trafficking crime, the jury had to find that the three men (1) during and in relation to a drug crime (2) aided and abetted the use of a firearm. 18 U.S.C. § 924(c)(1); 18 U.S.C. § 2; **United States v. Onick**, 889 F.2d 1425, 1431 (5th Cir. 1989). "Possessing illegal drugs with the intent to distribute constitutes a drug trafficking crime for the purpose of" § 924(c). **Onick**, 889 F.2d at 1431 (citing **United States v. Robinson**, 857 F.2d 1006, 1010 (5th Cir. 1988)). A defendant need not use or brandish the weapon to be guilty under § 924(c), as long as the Government shows that the weapon was available to facilitate the crime. **United States v. Molinar-Apodaca**, 889 F.2d 1417, 1424 (5th Cir. 1989).

Initially, we must determine the appropriate standard of review for the instructions on the firearms count. If a defendant fails to object to an instruction, this court reviews only for plain error. Fed. R. Crim. P. 52(b); **United States v. Frady**, 456 U.S. 152, 163 (1982). Counsel objected to an earlier version of instruction G-11[1] for lack of a statement about the requisite

---

[1]     In order to prove that a defendant used or carried a firearm during and in relation to a drug trafficking crime, the Government does not have to prove that the defendant had actual possession of the weapon or that he used it in any affirmative manner. It does require evidence that the firearm was available to provide protection to the defendant in connection with his engagement in drug trafficking.

12

knowledge by the defendants of the presence of the weapon.[2]  After the court amended the charge,[3] stating "[t]hat will satisf[]y knowledge," counsel made no further objection.

Ordinarily we do not require repeated objections to an instruction.  **Osborne v. Ohio**, 495 U.S. 103, 124 (1990).  In determining the sufficiency of objections we apply "the general principle that an objection which is ample and timely to bring the alleged . . . error to the attention of the trial court and enable it to take appropriate corrective action is sufficient to . . . preserve the claim for review."  **Id.** at 125 (quoting **Douglas v. Alabama**, 380 U.S. 415, 422 (1965)).  We are persuaded that counsel's objection was adequate to alert the court of her position that the defendant's knowledge of the presence of the weapon was an essential element of the offense.  We therefore review the adequacy of the charge **de novo**.

Appellants' argument focuses on the state of mind required to convict them of this offense.  They contend that the court's charge completely failed to instruct the jury on this element.  Generally,

---

[2]     Counsel stated:

> I do have an objection.  I think when it talks about it being available, that we need to include within this a statement about knowledge, that in order for it to be available, the defendant had to have knowledge of its presence.

[3]     Amended Instruction G-11 required "evidence that the firearm was **made available by at least one of the defendants** to provide protection to the defendant in connection with his engagement in drug trafficking." (emphasis ours).

failure to instruct the jury on every essential element of the offense is error. **United States v. Winship**, 724 F.2d 1116, 1124 (5th Cir. 1984).

The defendants were charged with aiding and abetting the use of a firearm. An aider and abettor must share in the criminal intent of the principal. **See United States v. Triplett**, 922 F.2d 1174, 1178 (5th Cir.), **cert. denied**, 114 L.Ed.2d 486 (1991) (quoting **United States v. Ortiz-Loya**, 777 F.2d 973, 980 (5th Cir. 1985)). To support a § 924(c) conviction, the government must prove that a defendant **knowingly** used a firearm. **United States v. Wilson**, 884 F.2d 174, 178-79 (5th Cir. 1989) (citing **United States v. Nelson**, 733 F.2d 364, 370-71 (5th Cir.), **cert. denied**, 469 U.S. 937 (1984)). To convict, the jury was required to find, therefore, that each defendant as an aider and abettor knew that the gun was at least available to one of the defendants. **See Nelson**, 733 F.2d at 371; **see also United States v. Hamblin**, 911 F.2d 551, 557-58 (11th Cir. 1990), **cert. denied**, 114 L.Ed.2d 482 (1991) (government has burden of proving that aider and abettor shared criminal intent of codefendant with respect to § 924(c) firearms charge). Unfortunately, the court's instruction does not address the state of mind element of the offense, except to suggest that if one of the defendants used the weapon (and therefore knew of it) then all defendants were guilty of the offense.[4] An instruction under

---

[4] Instruction G-9 reads as follows:

> Two elements are required to be proved beyond a reasonable doubt in order to establish the offense charged in Count Three of the indictment, as follows:

14

**Pinkerton v. United States**, 66 S.Ct. 1180 (1946), may have been appropriate, at least if the defendants had been charged with some conspiracy. **See United States v. Raborn**, 872 F.2d 589, 596 (5th Cir. 1989). But as no conspiracy whatever was charged or instructed on, the instruction is deficient for the charged offense of aiding and abetting the use of a firearm because knowledge of the use of the firearm is an essential element of the offense. Also, we cannot say that this erroneous instruction was harmless-- all of the defendants argued that they did not know the weapon was in the room and the government's proof on this point was meager. Thus we find it conceivable if not likely that the jury would have

---

First. That while the defendants were engaged in aiding and abetting each other to possess cocaine and cocaine base with intent to distribute the same, either one or all three of them carried or used a firearm; and

Second. That either one or all three of them did so during and in relation to a drug trafficking crime.

The term "drug trafficking crime" means any felony punishable under the Controlled Substances Act, and includes the offense charged in Count One of the Indictment, that is, aid and abet to possess coke with intent to distribute the same.

If one of the defendants carried or used a firearm during and in relation to a drug trafficking crime at a time when all defendants were mutually engaged int he drug crimes alleged, then all defendants are equally guilty of using or carrying a firearm during and in relation to a drug trafficking crime.

15

acquitted the defendants, or some of them, had the jurors understood that knowledge of the presence of the weapon was an essential element of the offense.

Because of double jeopardy considerations, we next consider appellants' sufficiency arguments on this count.

They contend primarily that the evidence failed to establish that they knew the weapon was in the room.[5]  In determining whether the government established that the defendants formed the necessary intent to commit the charged offense, the question narrows to whether the record supports an inference that Williams, Green, and Kitchens knew that one of them had a firearm available for use. **See Nelson**, 733 F.2d at 371.

The evidence is sufficient to uphold Williams's conviction on Count III.  Williams was sitting on the sofa cushion under which the .25 caliber pistol was found.  The jury could infer that Williams knew the gun was under the cushion on which he was seated.  The gun was situated with the butt facing out, was readily accessible, and was loaded.  In **United States v. Morris**, 977 F.2d 617 (D.C. Cir. 1992), the court found that guns concealed under the cushions of a couch were "used" in relation to a drug trafficking offense because the loaded guns were readily accessible and were near the door, through which an intruder might be expected to enter.  Thus, a reasonable jury could infer that Williams willfully

---

[5]  We have already rejected appellants' argument that the evidence did not establish that they were engaged in drug trafficking at 1009 Holmes.

16

associated and participated in the use of the gun to protect the drug operation.

The validity of Green's and Kitchens's convictions on this count depends on whether the record supports an inference that they knew the gun was available to Williams. Our review of the record reveals no evidence that Green or Kitchens ever saw the gun or knew of its presence. The record does not reveal that the gun which was under the couch cushion was visible to Green or Kitchens. The government established no other connection between Green and Kitchens and the weapon. Because the evidence does not support an inference that Green and Kitchens knew the gun was available to Williams, the evidence is insufficient to support Green's and Kitchens's convictions on this count.

## III.

The defendants argue finally that they are entitled to a new trial based on the evidence they discovered after the trial that the Mississippi Crime Lab chemist, Jon Maddox, was caught pilfering drugs from the lab. Defendants argue that if they had been allowed to present this evidence the jury could have concluded that Maddox tampered with the seized substances. Before denying appellants' motions for new trial, the district court held a post-trial evidentiary hearing, at which Maddox and others testified.

Defendants argue that evidence of Maddox's malfeasance entitles them to a new trial on three grounds: (1) the prosecution withheld the evidence of Maddox's misconduct in violation of **Brady v. Maryland**, 373 U.S. 83 (1963); (2) the newly-discovered evidence

17

entitles them to a new trial under **United States v. Nixon**, 881 F.2d 1305 (5th Cir. 1989); and (3) Maddox's possible tampering with the drugs is a break in the chain of custody of the evidence. We consider each of these arguments in turn.

**Brady v. Maryland** holds "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87. A **Brady** violation entitles a defendant to a new trial "only when the court determines that there is a reasonable probability that the trial result would have been different." **United States v. Nixon**, 881 F.2d 1305, 1308 (5th Cir. 1989).

Under **United States v. Nixon**, newly discovered evidence may justify a new trial if: (1) the evidence was discovered after trial; (2) the failure to discover the evidence was not due to defendants' lack of diligence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) a new trial probably would produce a new result. **Nixon**, 881 F.2d at 1311. We review the denial of a motion for a new trial based on newly discovered evidence for abuse of discretion. **United States v. Alvarado**, 898 F.2d 987, 994 (5th Cir. 1990).

We conclude that it is extremely unlikely that a jury presented with evidence of Maddox's misconduct would find that the substance the defendants flushed down the toilet was not cocaine or crack. The circumstances surrounding the disposition of the drugs reveal the defendants' belief that the drugs were illicit.

18

Sergeant Hanners's field test identified the drugs as cocaine. No evidence was discovered that Maddox pilfered or used cocaine in any form. He was addicted to prescription drugs such as Dilaudid, Demerol, Tylox, and Percodan. No evidence suggests that he pilfered any other drugs from the state lab. At trial another chemist, Ted Chapman, testified that his analysis showed that the substances were cocaine and crack. The district court did not abuse its discretion in rejecting appellants' motion for new trial predicated on **Brady** and **Nixon**.

Finally, we consider appellants' argument that Maddox's potential tampering with the evidence broke the chain of custody of the cocaine. Our review of the record gives us no reason to believe that Maddox tampered with the evidence in this case. Thus, the district court did not abuse its discretion in denying appellants' motion for new trial on grounds that the government's chain of custody predicate for the drugs was flawed. **See United States v. Whitley**, 905 F.2d 163 (7th Cir. 1990).

IV.

For the reasons stated above, we affirm the defendants' convictions on Counts I and II. Because the court's instruction was deficient on Count III, however, we reverse the defendants' convictions on that count. The government may, however, if it elects to do so within a reasonable time, retry Williams on Count III. Because the evidence was insufficient to convict Green and Kitchens on this count, double jeopardy considerations preclude the government from retrying these defendants on Count III. **United**

19

**States v. Miller**, 952 F.2d 866, 870-71 (5th Cir.), **cert. denied**, 112 S.Ct. 3029 (1992).  Accordingly, we affirm in part, reverse in part and remand to the district court for resentencing and further proceedings consistent with this opinion.

AFFIRMED in part; REVERSED in part; and REMANDED.