UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 93-1079
_____

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

versus

SERGIO EDUARDO OREIRA and CARLOS HUMBERTO POSTIZZI,
Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Texas
_____

(August 4, 1994)

Before KING and SMITH Circuit Judges, and KAZEN,[1] District Judge.

KAZEN, District Judge:


Sergio Eduardo Oreira (Oreira) and Carlos Humberto Postizzi (Postizzi) appeal from their convictions on three counts of structuring in order to evade the reporting requirements and one count of conspiracy. We reverse and remand.


*Background*

Federal law requires financial institutions to file a currency transaction report (CTR) with the Secretary of the Treasury for

_____

[1]District Judge of the Southern District of Texas, sitting by designation.

cash transactions greater than $10,000. 31 U.S.C. § 5313; 31 C.F.R. § 103.22(a)(1). It is illegal to structure, assist in structuring, or attempt to structure any transaction for the purpose of evading the filing of a CTR. 31 U.S.C. §5324(a)(3). A person "willfully violating" the antistructuring section is subject to criminal penalties. 31 U.S.C. §5322.

Defendants Oreira and Postizzi worked for Continental Transfer Services d/b/a Servicios Continental ("Continental") in Houston.[2] Continental was a "giro" house which wired money for its customers in the United States to individuals or companies in other countries. Oreira was an employee of Continental and Postizzi was its vice-president. From late 1989 to March 1991, Continental did business in Houston. Oreira and Postizzi would accept money from customers, allegedly manufacture customer records in amounts under $10,000, and wire the money to different locations outside the United States, mostly to Colombia.

One business associate of the Defendants was Patricia Gomez. Gomez was also a government informant. In the fall of 1990, Gomez met with the Defendants. On two of these occasions, Postizzi instructed Gomez how to prepare fictitious receipts while Oreira was present. Based in part on the information she gathered from these meetings, IRS Agents executed a search warrant on Continental's premises on March 22, 1991. A few days later, the

---

[2]Two other members of Continental were indicted with Oreira and Postizzi. Jorge Somoza, the President of the company, was convicted with Oreira and Postizzi but is not a party to this appeal. Lilliana Gamba, an employee of the company, pleaded guilty to a reduced offense during the trial.

Secretary of the Treasury issued a geographic targeting order requiring Continental to file CTRs for any amount of money over $100 during the next six months.

In April 1991, Postizzi and Oreira assisted in changing Continental's name to Exprotur and executed a new lease in a Fort Worth strip mall. In early June 1991, Oreira and Gamba opened new bank accounts in Fort Worth. The Fort Worth bank accounts were not subject to the geographical targeting order. From June 4 to June 21, 1991, Oreira, Gamba and Postizzi accepted money from customers, and on the same day, would deposit money in amounts greater than $100 but less than $10,000 into different bank accounts at various banks in Fort Worth. The money was wired to different locations outside the United States, again mostly to Colombia.

Oreira and Postizzi were convicted of three counts of structuring transactions with domestic financial institutions in order to evade the filing of CTRs under 31 U.S.C. §§ 5313, 5322 and 5324, and one count of conspiracy to commit those acts under 18 U.S.C. § 371. The Defendants were sentenced to imprisonment for 70 months, plus three years of supervised release. Oreira and Postizzi challenge their conviction and sentence.[3]

---

[3]The Defendants challenge the enhancement of their sentences under U.S.S.G. 1B1.3(a)(1)(B), U.S.S.G. 2S1.1(b)(2), and U.S.S.G. 2S1.3(b)(1). In view of the remand for a new trial, we do not reach this question.

*Analysis*

*Jury Instructions*

The Defendants contend that the district court erred by refusing to submit Defendants' requested definition of the term "willfully". 31 U.S.C. §§ 5324, 5322. The proposed instruction read:

> The word "willfully," as that term has been used from time to time in these instructions, means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law.

Instead, the relevant portion of the jury charge read:

> It is not necessary for the Government to prove that a defendant knew that structuring or assisting in structuring a transaction to avoid triggering the filing requirements was itself illegal. The Government need only prove beyond a reasonable doubt that a defendant structured or assisted in structuring currency transactions with specific intent to avoid said reporting requirements. In other words, a defendant's ignorance of the law prohibiting structuring is no defense if he knew about filing requirements and intentionally acted to evade or assisted in evading them.

Generally, failure to instruct the jury on an essential element of the offense is error. *United States v. Williams*, 985 F.2d 749, 755 (5th Cir. 1993), *cert. denied*, ___ U.S. ___, 114 S.Ct. 148, 126 L.Ed.2d 110 (1993). Although the district court's instruction was a correct statement of Fifth Circuit law at the time of trial,[4] the Supreme Court has since reached a contrary result. In *Ratzlaf v. United States*, the Supreme Court held that in order to convict a

---

[4]*United States v. Beaumont*, 972 F.2d 91, 94 (5th Cir. 1992).

4

defendant under 31 U.S.C. §§ 5322 and 5324, it does not suffice for the government to prove that the defendant knew of the bank's reporting obligation and attempted to evade it. *Ratzlaf*, ___ U.S. ___, ___, 114 S.Ct. 655, 657, 126 L.Ed.2d 615 (1994). The government must now also prove that a person, when structuring a currency transaction, knew that his conduct was unlawful. *Id*. The Defendants' requested instruction was therefore correct under *Ratzlaf*. Because *Ratzlaf* was issued while this case was still on direct appeal, the Defendants may invoke *Ratzlaf* as controlling. *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987). It was therefore error to fail to instruct the jury on willfulness.

The Government contends that the error was harmless because the Defendants at trial did not argue or claim that the Government failed to show they knew their conduct was unlawful. This argument is disingenuous, since our existing precedent and the trial court's ruling foreclosed any such argument. Moreover, as noted in *Ratzlaf*, "currency structuring is not inevitably nefarious." 114 S.Ct. 660-61. The Government directs our attention to the considerable evidence of intentional structuring, but this is not necessarily equivalent to an intent to do something illegal. The trial court here did not merely give an incomplete definition of "willfully," as in *United States v. Malone*, 837 F.2d 670 (5th Cir. 1988). Instead, through no fault of his own, the trial judge expressly but incorrectly told the jury that the Government need not prove the Defendants knew their conduct was illegal. We

5

decline to conclude that the jury, if properly instructed, would perforce convict these defendants of willfully violating the structuring laws.[5]

Two circuits have now held that failure to instruct on willfulness in a structuring case is plain error. *United States v. Jones*, 21 F.3d 165, 173 (7th Cir. 1994); *United States v. Rogers*, 18 F.3d 265, 268 (4th Cir. 1994). We need not find plain error here, since both Defendants requested the proper instruction and objected to its omission at trial. We conclude that the error was harmful.[6] The convictions must be reversed and the case remanded for new trial.

---

[5]Although there was not overwhelming evidence that the Defendants knowingly violated the law, there nevertheless was sufficient evidence to support a finding of guilt had the jury been properly charged. Accordingly a remand for new trial does not pose a double jeopardy problem.

[6]We recognize the apparent inconsistency in some of our opinions concerning the proper standard of appellate review in instances where the trial court fails to instruct the jury on all elements of a crime. For example, in *United States v. Ojebode*, 957 F.2d 1218, 1227 (5th Cir. 1992), *cert. denied*, ___ U.S. ___, 113 S.Ct. 1291, 122 L.Ed.2d 683 (1993), we said that a jury's verdict cannot stand if the instructions do not require it to find each element of the crime under the proper standard of proof, citing *Cabana v. Bullock*, 474 U.S. 376, 384, 106 S.Ct. 689, 696, 88 L.Ed.2d 704 (1986). To the same effect is dicta in *United States v. Ortega*, 859 F.2d 327, 333 (5th Cir. 1988), 489 U.S. 1027, 109 S.Ct. 1157, 103 L.Ed.2d 216 (1989). On the other hand, we have used a harmless error analysis in cases such as *Williams, supra*, 985 F.2d at 756, and *United States v. Bolin*, 876 F.2d 370 (5th Cir. 1989). *See United States v. Brown*, 616 F.2d 844, 846 (5th Cir. 1980), eschewing a *per se* plain error rule. The United States Supreme Court also appears to have rejected the *per se* rule suggested in *Cabana*. *Pope v. Illinois*, ___ U.S. ___, ___ 107 S.Ct. 1918, 1922 n.7, 95 L.Ed.2d 439 (1987). For these reasons, we use a harmless error analysis here.

6

Having determined that the case must be retried, it is appropriate to discuss other claims which are likely to arise in the new trial.

*Evidentiary Rulings*

The Defendants object to the testimony of IRS Special Agent Michael Balas, who testified as an expert on currency structuring. The Defendants contend that this testimony expressed an opinion on the essential element of their intent, which is solely a jury question under Fed. R. Evid. 704(b). They further argue that this testimony was "profile" testimony, which has been criticized by this and other circuits. The Government responds that the evidence is admissible under Rule 702 (Testimony by Experts) and 704(a) (Opinion on ultimate issue allowed), and should not be classified as profile evidence.

Balas described his experience with 60 different cases involving structuring or money laundering and his recent investigations of giro houses in the Houston area. He described the operation of illegal giro houses and how they structure transactions. Balas also presented a summary chart of all the wire transfers made by Continental between January 1990 and March 1991. Balas divided up the transferred funds into three categories based upon their destination, and observed that 95 percent of the wire transfers were to Colombia.

We agree with the Government that Balas' testimony as to how giro houses in Houston operated was helpful to the jury's understanding of the structuring charge. The giro house business

7

is specialized and most citizens are unaware of how a giro house works. This expert testimony assisted the jury in understanding the mode of operation of the Defendants. *See, e.g., United States v. McCollum*, 802 F.2d 344, 346 (9th Cir. 1986) ("Expert testimony regarding the typical structure of mail fraud schemes could help the jury to understand the operation of the scheme and to assess [the defendant]'s claim of non-involvement.") These parts of Balas' testimony were properly admitted by the trial judge.

We are, however, concerned about this portion of Balas' testimony:

MR. ROPER: Based on your training and experience, have you found that giro houses that are engaged in the circumvention of the CTR laws have a spread such as this with 95 percent going to Colombia and only 5 percent going to other countries?

AGENT BALAS: That is correct.

. . . .

MR. ROPER: Giros that are not attempting to circumvent the CTR laws, would they have the spread of 95.1 percent going to Colombia and 5 percent going to other countries?

AGENT BALAS: No, they wouldn't.

Nothing in Balas' testimony established a foundation for the proposition that because most customers of a giro house wire money to one country, the giro house is engaging in illegal structuring. For example, there was no evidence as to the national origin of the customers of the giro house or of the geographic area in which it was located. Moreover, there is no apparent logical connection between the destination of the money and the structuring laws of this country. The government disclaims -- and rightly so -- any argument that the particular country in question, Colombia, can be

8

the basis for an inference of illegality.  On retrial, a specific objection to these questions should be sustained.[7]

The Defendants also contend that the trial court violated Fed. R. Evid. 404(b) and 403 by admitting testimony of an expert witness that a narcotics-detecting dog alerted on one deposit of cash made by the Defendants into one of Exprotur's bank accounts.  The dog's handler was qualified as an expert and testified that the dog's alert indicated there was a detectable amount of drugs on the money.  The Government contends that the evidence shows the Defendants knew the money was drug money and thus had a motive to avoid the CTR requirements.

This circuit has established a two-part test for determining whether acts not alleged in the indictment are admissible under 404(b).  *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979); *United States v. Dula*, 989 F.2d 772, 777 (5th Cir.), *cert. denied*, ___ U.S. ___, 114 S.Ct. 172, 126 L.Ed.2d 131 (1993).  First, the extrinsic evidence must be relevant to an issue other than the defendant's character.  *Id*.  Second, the probative value of the evidence must not be substantially outweighed by its undue prejudice.  *Id*.

The contested evidence should have been excluded.  The dog's alert to the presence of narcotics on the money does little to

---

[7]We do not reach the difficult issue of line-drawing between Federal Rule of Evidence 704(a) and (b).  Nor do we express an opinion as to whether Balas' testimony constituted profile evidence.

prove the Defendants knew that the money was connected to drugs. At best, it indicates that the money, somewhere in its chain of custody, was in contact with narcotics.  Contrary to the Government's assertion, *United States v. Hernando Ospina*[8] acknowledges this crucial distinction.  There, the court condoned evidence of a dog alert on the Defendant's money to show that "the laundered money was drug proceeds," an element of the statute involved in that case, 18 U.S.C. §1952(a)(1).  *Id*. at 1583.  In the instant case, the money being drug proceeds was not an element of the offense, and the dog alert was not used for that purpose. Instead it was used to show that the Defendants knew the money was drug proceeds.  As such, its probative value was minimal and was substantially outweighed by the prejudicial impact of injecting the specter of narcotics trafficking into the case.

Oreira next challenges the admission of evidence relating to Continental's transactions in Houston.  This evidence described Continental's alleged money structuring prior to its move to Fort Worth.  Oreira contends that it was character evidence.  We disagree.  Oreira was charged in part with conspiracy to structure transactions.  The time period alleged in the indictment encompassed the Houston activity, although the overt acts described only the activity occurring in Fort Worth.  The Government introduced evidence of the Houston activities to show Defendants' motivation for the peremptory move to Fort Worth and the subsequent change in their methods of structuring.

[8]798 F.2d 1570 (11th Cir. 1986).

Oreira further contends that this evidence was unfairly prejudicial and that he was more prejudiced by its admission than his co-defendants, who directly ordered Continental's illegal transactions in Houston. Oreira claims that while in Houston, he was just a six-month employee of Continental and had no knowledge of his superiors' illegal activity. Although the admission of this evidence may have prejudiced Oreira, its probative value was not substantially outweighed by unfair prejudice. The evidence was highly probative because it showed that the Defendants had an interest in continuing their business in Fort Worth once the IRS had issued a targeting order in Houston. It also demonstrated a connection between the Defendants' business practices in Houston and Fort Worth. The fact that Oreira was arguably less involved in the Houston activities than Postizzi or others does not render the evidence inadmissible as to him.

*Written Jury Instructions*

Oreira argues that because the case was extremely complicated, the trial judge should have provided the jury with a written copy of the instructions in addition to the oral instructions. The weight of our precedent has, in fact, disapproved of the practice of providing written copies of the instructions to the jury in certain circumstances. *United States v. Perez*, 648 F.2d 219, 222 (5th Cir. Unit B), *cert. denied*, 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 388 (1981); *United States v. Hooper*, 575 F.2d 496, 498-99 (5th Cir.) *cert. denied*, 439 U.S. 895, 99 S.Ct. 256, 58 L.Ed.2d 242

11

(1978); *United States v. Schilleci*, 545 F.2d 519, 526 (5th Cir. 1977).  The trial court's refusal to do so here was well within its discretion.


## *Conclusion*

The CONVICTIONS on all four counts against Oreira and Postizzi are REVERSED, their sentences are VACATED, and the case is REMANDED for a new trial.