# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-41270

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MARIA GUADALUPE RUBIO-MENDOZA,

Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

March 2, 2016

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 5:13-CR-1240-1

Before BARKSDALE, CLEMENT, and HAYNES, Circuit Judges.

PER CURIAM:*

Maria Guadalupe Rubio-Mendoza claims the evidence was insufficient to support her jury-trial convictions for:  conspiracy to possess, with intent to distribute, one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 (count one); and possession, with intent to distribute, one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2 (count two).  In support, she asserts the evidence fails to

---

* Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

No. 14-41270

establish for either conviction her requisite knowledge and participation. AFFIRMED.

I.

After entering the United States at Roma, Texas, on 28 October 2013, Rubio and her husband, Ruben Luis Camberos-Magallon, were arrested later that day when Border Patrol Agents at a checkpoint near Hebbronville, Texas, discovered approximately 17 kilograms of heroin and cocaine in hidden compartments in Rubio's vehicle. She was the owner and driver; Camberos, the passenger. The drugs' value was estimated to be, at the high end, over $700,000. Three cell phones found in the vehicle helped link the couple to a drug conspiracy: Rubio's pink-and-white phone; Camberos' black phone; and a ZTE-brand phone, used for contacting other members of the conspiracy.

Rubio and Camberos were indicted for: conspiracy to possess, with intent to distribute, heroin (count one); and possession, with intent to distribute, heroin (count two). Camberos pleaded guilty to count two, testified for Rubio at her trial, and subsequently was sentenced to 135 months' imprisonment. A jury found Rubio guilty on both counts. For count two, she was convicted under the theory that, pursuant to 18 U.S.C. § 2, she aided and abetted the possession, with intent to distribute, heroin. She was sentenced to 151 months' imprisonment.

II.

By presenting her insufficiency challenges in motions for judgment of acquittal after the close of the Government's case and after both sides rested, Rubio preserved them for *de novo* review. *E.g., United States v. Mitchell*, 792 F.3d 581, 582 (5th Cir. 2015). Reversal is warranted only if the Government cannot establish that: "after viewing the evidence and all reasonable inferences in the light most favorable to the [Government], *any* rational trier of fact could have found the essential elements of the crime beyond a

No. 14-41270

reasonable doubt". *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir.) (en banc) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)), *cert. denied*, 135 S. Ct. 170 (2014). In that regard, "[t]he evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt, so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt". *United States v. Terrell*, 700 F.3d 755, 760 (5th Cir. 2012).

Both direct and circumstantial evidence are considered, of course, in evaluating the sufficiency of the evidence. *United States v. Rounds*, 749 F.3d 326, 333 (5th Cir. 2014). Moreover, jurors are "free to choose among reasonable constructions of the evidence", *United States v. Smith*, 739 F.3d 843, 847 (5th Cir. 2014) (quoting *United States v. Bliss*, 491 F. App'x 491, 492 (5th Cir. 2012)), and "retain[ ] the sole authority . . . to evaluate the credibility of the witnesses", *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) (quoting *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001)). In other words, for the latter, "it is not our [court's] role . . . to second-guess the determinations of the jury as to the credibility of the evidence". *United States v. Guidry*, 406 F.3d 314, 318 (5th Cir. 2005). Concerning credibility evaluations, and as noted, Camberos and Rubio testified at her trial.

Rubio maintains the evidence was insufficient to establish she knew about, or voluntarily participated in, the conspiracy, possession, or distribution of heroin. In that regard, she claims she was merely an unknowing transporter, as owner and driver of the vehicle in which the drugs were found. She also contends the Government failed to show she was connected to her husband's actions or to the ZTE cell phone, which, as stated, was used to communicate with others involved in the conspiracy.

For evidence to be sufficient for a conspiracy-to-possess-with-intent-to-distribute-heroin conviction (count one), the Government must prove the

No. 14-41270

following elements beyond a reasonable doubt: "(1) the existence of an agreement between two or more persons to violate narcotics laws[;] (2) [Rubio's] *knowledge* of the agreement[;] and (3) [her] *voluntary participation* in the conspiracy". *United States v. Patino-Prado*, 533 F.3d 304, 309 (5th Cir. 2008) (emphasis added). As noted, Rubio challenges the sufficiency of the evidence for the knowledge and participation elements.

"Knowledge of the presence of narcotics often may be inferred from the exercise of control over the vehicle in which the illegal drugs are concealed." *United States v. Resio-Trejo*, 45 F.3d 907, 911 (5th Cir. 1995). Rubio was the owner and driver of the vehicle containing the concealed drugs; but, "in secret-compartment cases[,] we have required additional circumstantial evidence to support knowledge because of the possibility . . . that a third party could conceal drugs in the vehicle of an unwitting defendant". *United States v. Gil-Cruz*, 808 F.3d 274, 277 (5th Cir. 2015). Other "circumstantial evidence of guilty knowledge includes, *inter alia* . . . : nervousness, refusal or reluctance to answer questions, inconsistent statements, and obvious or remarkable alterations to the vehicle. . . . The high value of concealed narcotics can also support knowledge." *United States v. Vasquez*, 677 F.3d 685, 694–95 (5th Cir. 2012) (citation omitted).

For the participation-in-the-conspiracy element, Rubio's "presence" is a "probative . . . factor to be considered" along with the surrounding circumstances. *United States v. Dean*, 59 F.3d 1479, 1486 (5th Cir. 1995).

For count two, possession with intent to distribute heroin, the Government must prove, beyond a reasonable doubt, that Rubio had: "(1) knowledge, (2) possession, and (3) intent to distribute the controlled substance [ ]". *United States v. Delgado*, 256 F.3d 264, 274 (5th Cir. 2001). Again, Rubio claims insufficient evidence of knowledge and participation. As discussed, for

4

this count, she was also charged with aiding and abetting, pursuant to 18 U.S.C. § 2.

To prove Rubio "aided and abetted 'both the possession of the drug and the intent to distribute it'", the Government is not required to show she personally did every act constituting the offense. *United States v. Delagarza-Villarreal*, 141 F.3d 133, 140 (5th Cir. 1997) (quoting *United States v. Williams*, 985 F.2d 749, 753 (5th Cir. 1993)).  Instead, she must have "*associated* with the criminal venture, purposefully *participated* in the criminal activity, and sought by [her] actions to make the venture succeed".  *United States v. Moody*, 564 F.3d 754, 758 (5th Cir. 2009) (quoting *United States v. Jimenez*, 509 F.3d 682, 689 (5th Cir. 2007) (emphasis added).  For the association element, she must have "shared in the criminal intent of the principal".  *United States v. McDowell*, 498 F.3d 308, 313 (5th Cir. 2007) (alteration omitted) (quoting *United States v. Smith*, 546 F.2d 1275, 1284 (5th Cir. 1977)).  And, participation requires her acting in some affirmative manner to aid the venture.  *Id.*

The following is part of the evidence presented at trial.  (Again, Rubio and Camberos testified.)

At around 2:30 p.m. on 28 October 2013, Rubio drove her white 2007 Ford Mondeo across the United States-Mexico border at the Roma, Texas, port of entry, across from Miguel Aleman, Mexico.  About an hour earlier, her husband, Camberos, had entered separately, allegedly because the couple (married two months previously) had quarreled; he walked across the pedestrian bridge at Roma; and Rubio picked him up on the United States side.

Later the same day, based on the records in the United States Customs database, Rubio re-entered the United States, on foot, at the Rio Grande City, Texas, port of entry at 4:10 p.m.  She testified she did not cross the border a second time, but only visited that port of entry because, when she left Roma to

proceed to San Antonio, she had mistakenly set her GPS for the opposite direction, despite directions to San Antonio in her handwriting in a spiral notebook found in her vehicle ("83/359/16 a San Antonio").  She stated she had forgotten to obtain a Department of Homeland Security I-94A form (permitting travel over 25 miles from the border), which she purchased at Rio Grande City. The testimony was undisputed that:  Rubio had been to the United States before; and Camberos had never been to the United States and "felt lost" there.

From Rio Grande City, Rubio drove west toward Zapata, Texas (passing Roma, where she and Camberos originally entered), then north on Highway 16 toward San Antonio.  Approximately two miles south of Hebbronville, Texas, they stopped at the United States Border Patrol checkpoint at which they were arrested.  (Hebbronville is nearly 80 miles northeast from Roma.)  Rubio testified that she was traveling to San Antonio (through Hebbronville) to seek treatment for cancer, but without making any appointments with oncologists. In that regard, Camberos testified he told Rubio to find doctors they could visit while in the United States.

Concerning the drugs found in Rubio's vehicle, Camberos testified: several days before their trip to the United States, he told Rubio he was taking her vehicle for regular maintenance (she testified she believed him); instead, he took it to a group of men in Guadalajara, Mexico, who concealed drugs in the vehicle in exchange for a 100,000-peso loan, approximately the amount the couple was in debt.  In that regard, the Government presented evidence that: the Border Patrol Agents' dog signaled for drugs at the checkpoint south of Hebbronville; an x-ray showed anomalies in the side frames; and, upon removing the rocker panels, the Agents discovered fresh paint covering the trapdoors leading to the drugs and a strong smell of Bondo, signifying drugs were hidden recently.

No. 14-41270

Rubio testified at length regarding her previous visits to the United States. She claimed that each time she visited in 2013, the year of her arrest, she sought cancer treatment, which Camberos confirmed. He testified that she: was diagnosed with cancer in 2011; had two surgeries and chemotherapy; recovered in November 2012; and learned she had cancer again "[d]ays before the[ir] wedding" in September 2013.

According to Rubio, her cancer was terminal. At trial, however, she did not present any medical records corroborating that claimed diagnosis. Instead, she claimed she had carried the records with her into the United States, but a DEA Special Agent had kept them. And, although she maintained Camberos' insurance would cover her cancer treatment, and that, via the Internet, the insurance agent would send her paperwork showing that coverage, that evidence was not presented at trial.

Regarding Rubio's claimed cancer, when she came to the United States in July 2013, she found the names of doctors online, did not schedule any appointments (because, she stated, she was not covered by a United States insurance policy), and instead flew to San Antonio to knock on those doctors' doors. When unsuccessful, she flew back to Mexico. Shortly thereafter, according to her testimony, she drove through the McAllen, Texas, port of entry to The Cancer Center in Dallas, Texas, where she, again, had no appointments. She continued to Oklahoma, allegedly to find a good deal on a wedding dress; was caught in a severe thunderstorm, causing her to lose her bearings despite having a GPS in her vehicle; and stopped at a river in Missouri to pray and calm down. She testified that a Spanish-speaking sheriff's deputy in Missouri issued her a citation for speeding.

In response, a DEA Special Agent testified that the price of drugs increases as they move north. And, contrasting with Rubio's claimed cancer diagnosis (her claimed motive for visiting the United States) was the testimony

7

of the director of nurses at the Rio Grande Detention Center: cancer tests were performed post-arrest at the Laredo Medical Center on 10 December 2013, over four months before Rubio's trial, and showed no evidence of cancer. Moreover, following the traffic citation in Missouri in July, when Rubio entered the United States on the day of her arrest that October, she recently had changed her vehicle's license plate. She testified she had done so because she had moved, and it was safer in that area of Mexico to have local plates.

In addition to Rubio's testimony regarding previous visits to the United States, extensive evidence of cell-phone usage, pertaining to the drug conspiracy, was presented during trial. Both Camberos and Rubio testified that Rubio never possessed the ZTE phone Camberos claimed he used to contact other members in the drug conspiracy, as shown by the message and call history. Along that line, Camberos testified Rubio had never seen the ZTE phone. But, Rubio stated she saw him using it. Moreover, the evidence showed ten calls from the ZTE phone to, *inter alia*: Rubio's pink-and-white phone; and to drug-smuggling contacts identified as Fido and Walle. Government witnesses could not place the ZTE phone in Rubio's possession.

As part of its proof pertaining to Rubio's knowledge and participation, the Government pointed to several text messages from the ZTE phone. One to Walle about 20 minutes after Rubio's driving across the border at Roma stated: "We're traveling together to Laredo with no news". Other text messages from the ZTE phone similarly updated the conspiracy contacts on Rubio and Camberos' location. For example, one text message from the ZTE phone to Fido, at 6:34 p.m., stated, "Half an hour from Hebbronville along [Highway] 16". A message a few minutes later stated to Walle: "Half an hour from Hebbronville. Everything's okay. Respecting the limit". Another message to Walle at 6:39 p.m. confirmed a police presence 20 minutes south of the Hebbronville checkpoint. Similarly, the text messages received on the ZTE

phone from Walle, Fido, and an unidentified phone number requested "news"; and, after the couple was arrested, that "the owner of the phone" be allowed to answer "so that I can know what to do". Camberos testified that the above-referenced unidentified phone number belonged to an unknown drug trafficker; but, as the Government noted, the number was also entered as a contact on Camberos' black phone.

Again, in reaching its verdict on the two counts, the jury was entitled to weigh the testimony for and against Rubio's guilt and choose from reasonable constructions of the evidence. Of extreme importance in this instance, in making its decision, the jury retained the sole authority to evaluate the credibility of the witnesses, which included Rubio and Camberos. In that light, concerning Rubio's claimed lack of knowledge and participation for each count, and considering the evidence and all reasonable inferences in the requisite light most favorable to the Government, a rational juror could find, beyond a reasonable doubt, that Rubio was guilty on both counts.

III.

For the foregoing reasons, the judgment is AFFIRMED.