**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

_____

No. 93-2722
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JOSE REGOLO FLORES-CHAPA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

(March 10, 1995)

Before REAVLEY, DUHÉ and PARKER, Circuit Judges.

DUHÉ, Circuit Judge:

Appellant Jose Regolo Flores-Chapa appeals from the jury's verdict finding him guilty of conspiracy to possess with intent to distribute in excess of 5 kilograms of cocaine and aiding and abetting possession with intent to distribute in excess of 5 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 18 U.S.C. § 2. For the reasons set forth below, we reverse and remand with instructions.

## I. PROCEDURAL BACKGROUND

Jose Regolo Flores-Chapa (Appellant), Mario Gonzales (Gonzales) and Juan Jose Castillo (Castillo) were indicted in a two-count indictment charging them with the crimes noted above. Gonzales and Castillo pleaded "guilty" and Appellant pleaded "not guilty" and was found guilty on both counts.

Appellant raises four points of error on appeal:  1)  The evidence was insufficient to prove guilt beyond a reasonable doubt; 2)  The district court abused its discretion by failing to grant a mistrial after the government referred to previously excluded evidence before the jury;  3)  The district court abused its discretion under Fed. R. Evid. 404(b) by allowing the government to introduce evidence of Appellant's prior drug conviction;  4)  The government committed plain error when it referenced excluded evidence in its closing argument.  Because we find the government's closing argument--when combined with the previous improper statements--constituted plain error requiring reversal and that the admissible evidence was insufficient to sustain the conviction, we do not decide the remaining issues.

## II.  FACTS

In April of 1993, a confidential informant (CI) advised the Drug Enforcement Administration (DEA) of a pending cocaine transaction at the Marriott Hotel located at the Intercontinental Airport in Houston.  Under DEA supervision, the CI agreed to purchase 40 kilograms of cocaine at a price of $16,500 per kilogram.  The CI understood that the cocaine would be delivered by Mario Gonzales.  On April 2, 1993, Mario Gonzales flew to Houston from his home in Roma, Texas.  As agreed, the CI met Gonzales at the airport, and gave him the keys to a van.[1]  Gonzales left the airport in the van and was followed by the DEA to an

---

[1]    Unknown to Gonzales, the van was actually a DEA undercover vehicle.

2

Econolodge motel.  Gonzales testified that the arrangements for the delivery of the cocaine were made by a man named Ramirez, who was also from Roma.

Delivery was to be made at a prearranged site in Houston by a young man driving an orange pick-up.  To confirm his readiness to take delivery, Gonzales had been instructed to call either a pager or a residence telephone number.  He first tired to call the pager, but discovered that the hotel telephone system would not allow calls to be placed to a pager.  Next, Gonzales called the residence number, and a woman informed him that "no one was there."  He gave the woman his telephone and room numbers, and asked her to call the pager.  After waiting unsuccessfully for a return call, he left for the designated meeting site--a Chevron gas station--followed closely by the DEA.  At the station, Gonzales began to call the pager, but decided not to when he discovered that the public phone would not receive incoming calls.  Instead, Gonzales again phoned the residence, and a woman informed him that the orange truck was on its way.

A short time later, Juan Castillo pulled into the station driving an orange, 1981 Ford pick-up.  Castillo and Gonzales traded keys, and Gonzales told Castillo that he would call when he was ready to exchange the pick-up for the van.  At this point, the DEA surveillance team divided.  Part of the team followed Gonzales in the orange pick-up back to the Marriott, while the remaining agents followed Castillo in the DEA van.  After returning to the Marriott, Gonzales met the CI and took him to the orange pick-up.  Gonzales

opened a built-in tool box in the truck bed, and showed the CI the cocaine. As Gonzales closed the tool box, the CI gave the DEA surveillance team a pre-arranged signal, and Gonzales was arrested.

In the meantime, the other DEA surveillance team followed Castillo to the Arbor Oaks Apartments--located almost directly across the street from the Chevron station. After this surveillance team learned that Gonzales had been arrested, they obtained Castillo's apartment number from the apartment manager, and proceeded to his apartment. The agents were greeted at the door by Alma Flores (Mrs. Flores) and Esmeralda Castillo (Mrs. Castillo). Mrs. Flores and Mrs. Castillo confessed to ownership of the truck, and gave the agents permission to search the apartment.

After entering the apartment, the agents conducted a "protective sweep," and discovered Castillo sitting on a bed watching T.V. Castillo was escorted to the front porch where he was interviewed by some of the agents. As a result of the interview, the focus of the investigation shifted to the Appellant. In addition to Mrs. and Mr. Castillo, the agents discovered that Appellant and his wife Mrs. Flores (the parents of Esmeralda) also occupied the apartment.

Several agents remained at the apartment to continue surveillance, while the rest transported Castillo to the Harris County Jail. Shortly after the agents transporting Castillo departed, Appellant returned and was immediately arrested. While searching Appellant, an agent discovered a small quantity (11.8 grams) of cocaine in his boot and a pager on his person. The agent

4

was able to retrieve three telephone numbers from Castillo's pager. One of the numbers matched the phone number and room number of Gonzales' room at the Econolodge. Another number corresponded to Gonzales' pager. The identity of the third number was not disclosed.

### III. IMPROPER ARGUMENT

During the course of the trial, the district court ruled that certain testimony adduced by the government was inadmissible and instructed the jury to disregard the testimony. Nevertheless, the government made reference to the excluded testimony during examination of the very next witness. Defendant again objected and moved for a mistrial. The court denied the mistrial, admonished the government at the bench and instructed the jury that the lawyer's statements were not evidence. Despite two sustained objections, a specific warning to government counsel and two specific instructions to the jury, the government again made reference to the excluded testimony during its closing argument. Appellant asserts that this government conduct deprived him of a fair trial.

Appellant objects to the government's closing for the first time on appeal, therefore, we review for plain error. Under our recent en banc decision in United States v. Calverley,[2] we review for plain error using a three-part test. First, there must be

---

[2]    37 F.3d 160 (5th Cir. 1994)(en banc).

error,[3] next, that error must be plain,[4] and finally, the error must affect substantial rights.[5]

Our analysis must begin with the allegedly objectionable statement. Appellant complains of the following portion of the government's closing,

> He [Appellant] gets the pager message from his wife, everything--he's ready to go, he thinks the--the broker says everything is ready, he sends his son-in-law with the dope. Son-in-law arrives, makes the exchange, and unfortunately for them, good for us, he's making it under DEA supervision. He is arrested.

(emphasis supplied).[6]

## A. Was there Error?

Without question, the government's statement during its closing constituted error. The impropriety of the statement is keyed to the district court's initial ruling finding certain hearsay evidence inadmissible. Therefore, we must first examine the court's initial ruling.

The original hearsay evidence was adduced during direct examination of DEA Agent Cheryl Roberts:

> A.  He [Castillo] stated that he was driving the orange truck.  He was--he picked it up.  His father-in-law

---

[3]  Id. at 162.

[4]  Id.

[5]  Id. at 164.

[6]  In the government's rebuttal argument a similar statement was made, "That's what's happened here. The father-in-law is telling the son-in-law, `Got the page. Take the drugs.' He does, and they're arrested." (emphasis supplied). While Appellant fails to raise this statement on appeal, it provides further indicia of how the error was magnified by the government's conduct throughout the trial.

> [Flores-Chapa] told him to pick it up at a store and
> drive it to the Chevron station.

(emphasis supplied). Appellant immediately objected to the hearsay testimony. The district court sustained the objection and instructed the jury to disregard Roberts' answer.[7] However, during direct examination of the very next witness, the following exchange occurred:

> MR. GARCIA [for Appellant]:    Your Honor, before we get into a situation of something that he shouldn't testify to, I think perhaps he should be admonished regarding the statement we just approached the bench about.
>
> M   M   M   M
>
> MR. MAGLIOLO [for Government]:    Your Honor, I instructed the witness as per your prior ruling not to go into what Mr. Castillo said about who told him to drive the truck. He's already been instructed.
>
> MR. GARCIA:    Your Honor, may I approach the bench?
>
> THE COURT:    Yes.
>
> (Discussion at Bench as Follows:)
>
> MR. GARCIA:    At this time the defendant would move for a mistrial. The Government just made a statement into the record reciting the very statement that the Court has just said is not admissible. The record would speak for itself that Mr. Magliolo just said--you told him not to get into the statement and then he read--he recited the statement for the jury in open court. And I--
>
> COURT:    I'm going to deny the motion because the previous witness, Roberts, already answered the same question, and I have instructed the jury to disregard it.

---

[7]    Appellant objected on the basis that Castillo's statement was made post-arrest, and therefore, if a conspiracy involving Flores-Chapa existed, the statement was made after the conspiracy had ended, and therefore was not admissible under Fed. R. Evid. 801(d)(2)(E). The district court sustained the objection.

7

Just a minute.  <u>I will instruct the Government not to go into any type of conduct like that</u>.

And you [Garcia] need to make objections to particular questions.  I don't know yet whether you objected to the last question asked this witness.

MR. GARCIA:  I am objecting.  The problem is that they are blurting it out before a question is asked.  In other words just going on a narrative, Judge.  And I'll-- I'm having to deal with that.

THE COURT:  You need to object when the question is asked.  Not after the question has been answered.  Are you objecting to that question?

MR. GARCIA:  Yes, I am.

THE COURT:  All right.  The objection is sustained.

(In Open Court)

MR. GARCIA:  I will ask the Court instruct the jury to disregard Mr. Magliolo's statements, and instruct them that whatever he says is not evidence, Judge.

COURT:  The jury will disregard any comments made by the prosecutors or the defense lawyer.  I will instruct you later that what the lawyers say is not evidence.

What you may consider as evidence is what the witnesses say under oath, unless I told you to disregard anything that the witness has said, and such written exhibits, if any, that I admit.

What the lawyers say is not evidence and should not be considered by you for any purpose.

(emphasis supplied).

The government contends that the questioned statement was not made in reference to the excluded evidence, but rather was a fair comment on the testimony of DEA agents Donald Barnes and Kevin Stanfill.  Agent Barnes was accepted by the district court as an expert witness.  He testified regarding the general structure of

8

drug organizations, stating that drug organization were often comprised of family members and usually had an "overseer" or "broker" who arranged or monitored the transaction.

Agent Stanfill was not offered or accepted as an expert, and basically acted as a fact witness recounting the events of the drug transaction. He did not mention Appellant during direct examination, and admitted on cross-examination that he had no indication of Appellant's involvement with the transaction until he saw Appellant at the DEA office after his arrest. Nonetheless, on redirect examination, the following exchange occurred,

> Q. Agent Stanfill, based on your experience as a DEA agent, are the only people involved in a drug conspiracy the people that are arrested at the scene of the crime?
>
> A. No, sir.
>
> Q. All right. And would it be fair to say that someone was in control of the Houston end of this 40 kilos?
>
> A. Yes, sir.
>
> Q. And if it wasn't the 19-year-old, 20-year-old Mr. Juan Castillo, who would it be?
>
> A. <u>I would think it would be Mr. Chapa, sir, based on my experience</u>.

(emphasis supplied). No objection was made to this testimony.

While both agents expressed their opinion that Appellant was a member of the conspiracy and in charge of the cocaine, neither agent opined or inferred that Appellant instructed Castillo to drive the truck to the meeting site. Therefore, the government's statement can only be regarded as a direct reference to the testimony that the district court had specifically excluded. Acceptance of the statement was therefore error.

9

**B.  Was it Plain?**

As we set out in <u>Calverley</u>,

The Supreme Court has taught repeatedly that "plain" errors are errors which are "obvious," "c l e a r ," o r readily apparent;" they are errors which are so conspicuous that "the trial judge and prosecutor were derelict in countenancing [them], even absent the defendant's timely assistance in detecting [them]."

United States v. Calverley, 37 F.3d at 163 (footnotes omitted).  As discussed previously, the government's statement cannot be read to be anything other than a comment on the excluded evidence.  We also recognize that while the Appellant could and indeed should have objected, he would have done so with the risk of calling additional, and unwanted, attention to the remark.  <u>See</u> <u>e.g.</u> <u>United States v. Garza</u>, 608 F.2d 659, 666 (5th Cir. 1979).  We find that, even absent objection from Appellant, the district court should have recognized the obvious impropriety of the statement.

**C.  Did the Error Affect Substantial Rights?**

Having found that the statement was "error" that should have been "plain" to the trial judge, we must address whether the error affected the Appellant's substantial rights.  "[I]n most cases the affecting of substantial rights requires that the error be prejudicial; it must affect the outcome of the proceeding." <u>United States v. Calverley</u>, 37 F.3d at 164.  Viewing the statement in the context of the entire trial, we find that the statement was prejudicial.

In this case, the prejudicial significance of the statement was magnified by two factors.  First, the error was magnified by the government's conduct at the trial.  As discussed previously,

the government itself not only elicited the original hearsay, but then repeated the excluded evidence in front of the jury. Second, the error had a more profound effect due to the paucity of evidence of Appellant's involvement.[8]

We find that the government's conduct at trial, combined with the paucity of evidence, magnified the effects of the government's statement. As a result, we find that the error affected Appellee's substantial rights.

## IV. SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

Convictions must be affirmed if the evidence, viewed in the light most favorable to the verdict, with all reasonable inferences and credibility choices made in support of it, is such that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Kim, 884 F.2d 189, 192 (5th Cir. 1989). In making this determination, we need not exclude every reasonable hypothesis of innocence. United States v. Henry, 849 F.2d 1534, 1536 (5th Cir. 1988). Juries are free to use their common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence. United States v. Cruz-Valdez, 773 F.2d 1541, 1546-47 (11th Cir. 1985) (en banc), cert. denied, 475 U.S. 1049 (1986).

### B. The Elements

---

[8]     See section IV infra.

11

In a narcotics conspiracy prosecution, the government must prove beyond a reasonable doubt:  (1) that an agreement to violate the narcotics laws existed between two or more persons, (2) that each alleged conspirator knew of the conspiracy and intended to join it, and (3) that each alleged conspirator did participate in the conspiracy.  United States v. Medina, 887 F.2d 528, 530 (5th Cir. 1989).  Proof of any element may be by circumstantial evidence, and "'[c]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation, . . . be sufficient to constitute conclusive proof.'" United States v. Roberts, 913 F.2d 211, 218 (5th Cir. 1990) (quoting United States v. Lechuga, 888 F.2d 1472, 1476 (5th Cir. 1989)).  As the Court noted in Marx, "assent to a conspiracy may be inferred from acts which furthered the purpose of the conspiracy." United States v. Marx, 635 F.2d 436, 439 (5th Cir. Unit B 1981); see also United States v. Middlebrooks, 618 F.2d 273, 278 (5th Cir.), cert. denied, 449 U.S. 984 (1980).

In a case brought pursuant to section 841(a)(1), the government must prove that Appellant knowingly possessed cocaine with the intent to distribute it.  United States v. Molinar-Apodaca, 889 F.2d 1417, 1423 (5th Cir. 1989).  Proof of constructive possession is sufficient; thus, any showing that the defendant exercised ownership, dominion, or control of the drugs, or of the premises on which they are found, will suffice.  See United States v. Diaz-Carreon, 915 F.2d 951, 954-55 (5th Cir. 1990); United States v. Thompson, 700 F.2d 944, 952 (5th Cir.

12

1983).

## C. The Evidence

The only evidence tendered by the government to show Appellant's guilt was:

1)   Appellant's beeper containing the phone numbers to Gonzales' motel room and pager;

2)   The quantity of cocaine found in Appellant's boot;[9]

3)   Appellant's wife's driver's license listing her address in Cleveland, Texas;[10]

4)   Testimony from a DEA agent (accepted as an expert witness) relating his experience regarding the organization of drug conspiracies;

5)   Testimony from a second DEA agent (not accepted as an expert witness) and offering his unfounded opinion that a man as young as Castillo would typically not be trusted with such a large quantity of cocaine, but that such responsibility

---

[9]   The probative value of the cocaine found on Appellant's person was called into question for two reasons.  First, the record reflects that DEA chemists determined that the cocaine retrieved from Appellant's boot was 87 percent pure while the 40 kilograms found in the orange truck was 89.9 percent pure.  Appellant asserts that this discrepancy is proof that the cocaine in his boot did not come from the larger quantity.  Appellee, on the other hand, asserts that the purity of the samples is sufficiently close so that an inference could be drawn that the smaller came from the larger.  Second, during cross examination of DEA Agent Foye, the agent admitted that Appellant might be a cocaine user, thereby implying--as Appellant argued in his closing--that Appellant possessed the cocaine for personal use.

[10]   The DEA believed that a stash of cocaine was being stored in a house in the vicinity of Conroe and Cleveland, Texas.  Appellee asserts that the driver's license provides a link between Appellant and the location from which the DEA believed that the 40 kilograms originated.   However, on cross-examination, Agent Barnes admitted that none of the DEA reports reflected the suspected location of the house in Cleveland, rather they all indicated that the stash house was thought to be located in Conroe.

13

would more likely be given to the Appellant;[11]

> 6) Fed. R. Evid. 404(b) evidence showing a nine year old conviction for <u>possession</u> of 28 grams of cocaine.[12]

At most, the evidence adduced by the government provides a weak inference of Appellant's involvement in the conspiracy. In application, however, with the exception of the beeper--which is admittedly the government's most damaging evidence--Appellant's cross-examination disclosed deficiencies in the evidence which further lowered its probative value.

At most, the government provided three pieces of tangible evidence, the beeper, the small quantity of cocaine, and the driver's license, plus a nine-year old conviction for <u>possession</u> of cocaine[13] and the testimony of two DEA agents who did little more than opine that Appellant was the overseer of the transaction.[14]

---

[11] As noted previously, this testimony was presented without objection.

[12] A Houston police sergeant testified that in 1984 Appellant was arrested with a small quantity of cocaine and charged with simple possession. On cross-examination, he testified that he had not witnessed Appellant or any of his five co-defendants selling drugs during his 32 hour surveillance of their motel room.

[13] While we make no finding whether this evidence was properly admitted under Fed. R. Evid. 404(b), we note that Appellant was again caught with a small quantity of cocaine on his person. Appellant has apparently been charged by the state with possession, and the simple fact that he has been known to possess small quantities of cocaine does not necessarily mean that he is involved in the distribution of larger quantities.

[14] While we have no intention or desire to impugn the veracity of the highly qualified agents who testified in this case, we express severe reservations regarding the type of opinion testimony that was permitted. We are especially concerned with the testimony of Agent Stanfill who testified, without being accepted as an expert witness and further without foundation or factual basis that "based on my experience" Appellant controlled the cocaine transaction.

14

The proffered evidence is too attenuated for a reasonable jury to find Appellant guilty of the conduct charged.[15] Simply put, but for the government's misconduct in this trial Appellant would never have been convicted.

### V.   CONCLUSION

For the foregoing reasons, we find that the government's closing argument constituted plain error requiring reversal of Appellant's conviction.  We further find that the evidence was insufficient to support his conviction.  We REVERSE, VACATE Appellant's sentence and REMAND the case to the district court with instructions to enter judgment of acquittal.

---

[15]   Cf. United States v. Carrillo-Morales, 27 F.3d 1054 (5th Cir. 1994), cert. denied sub nom., Austin v. United States, ___ U.S. ___, ___ S.Ct. ___, 1994 WL 737587 (1995); United States v. Mergerson, 4 F.3d 337 (5th Cir. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1310 (1993); United States v. Alvarado, 898 F.2d 987 (5th Cir. 1990).