**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

**No. 97-50309**

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**VERSUS**

**RAYMOND STEWART,**

**Defendant-Appellant.**

Appeal from the United States District Court
for the Western District of Texas

June 25, 1998

Before REAVLEY, DeMOSS, and PARKER, Circuit Judges.

DeMOSS, Circuit Judge:

Raymond Stewart was indicted for possession with intent to distribute crack cocaine. The jury found him guilty of that offense. Stewart timely appealed, challenging the sufficiency of the evidence to sustain the guilty verdict. Finding the evidence insufficient to sustain the verdict, we reverse the conviction.

**Background**

1

On September 7, 1995, Officer Ron Garney, an investigator with the Robertson County District Attorney's Office, stopped a champagne-colored Mazda 626 on Interstate 45 heading towards Waco, Texas. Garney stopped the vehicle when the driver failed to use a turn signal.[1]

Garney approached the car, which was driven by Stewart. Stewart's co-defendant, Roderick Watson, was in the passenger seat. Garney requested that Stewart step out of the car and stand on the side of the road. He then asked Stewart for his license. Though Stewart was unable to produce his license, he supplied Garney with his correct driver's license number. Stewart also told Garney that he and Watson had been to Houston on a business trip to promote rap and gospel music. When Garney checked Stewart's driver's license number, he learned that the license had been suspended.

Garney then asked Watson for his license. Watson tendered his license and clarified that the car belonged to Watson's girlfriend. Garney asked Watson for permission to search the car, and Watson consented. Garney then approached Stewart who was standing by the back of the car, and asked Stewart for permission to search the car. Stewart acted perplexed, as though he was unclear whether he

---

[1] Garney had received a "tip" earlier that afternoon that two men driving a car of that description and traveling from Houston to Waco might be carrying drugs. At trial, evidence relating to the tip was objected to and a limiting instruction was given. At oral argument, the government conceded that the information relayed by the informant was admissible for the limited purpose of justifying the traffic stop. The government in no way relied on the content of the informant's message as evidence in the case.

had the authority to give the officer permission to search Watson's girlfriend's car.  After learning that Garney had already received Watson's consent, Stewart expressed no objection to the search.  At some point during the traffic stop, and prior to Garney's request to search the vehicle, several backup officers arrived to support Garney.

After an extensive search of Watson's girlfriend's car, the officers found two nine millimeter weapons, one under the driver's seat and one under the passenger's seat.  Neither had Stewart's fingerprints.  Once the guns were found, both Stewart and Watson were arrested.  Watson was searched pursuant to his arrest, during which the officers found a plastic bag in his underwear containing approximately 96 grams of crack cocaine.  Watson told the officers that the cocaine and the guns belonged to him and that Stewart had no knowledge of the cocaine.  When approached separately, Stewart asked the officer why he was being arrested.  Garney responded that Stewart was being arrested for the guns.  Stewart and Watson were then placed in the back seat of Garney's patrol car.

The patrol car was equipped with an audio and video recording system.  This system is called a "page system."  A video camera facing out towards the front of the vehicle is mounted inside the car, next to the rear view mirror.  Officers who have cars equipped with the page system also have microphones attached to their uniforms.  An additional microphone is located in the back seat area of the car.  The officer switches the page system on from

inside the patrol car.

Once the system is turned on, the officer can remotely control which microphone is recording. When the officer turns off the microphone on his uniform, the microphone inside the vehicle begins recording. When he activates his uniform microphone, the microphone inside the car stops recording. Accordingly, once the page system is turned on, either the officer's uniform microphone is recording or the back seat microphone is recording. Once Garney placed Stewart and Watson in the patrol car, he switched off his uniform microphone, activating the microphone in the back seat of the patrol car.[2] The ensuing conversation between Stewart and Watson was recorded without their knowledge.

Stewart was indicted and found guilty of possession with intent to distribute crack cocaine. He was sentenced to 235 months imprisonment, five years supervised release, a fine in the amount of $3,000, and a mandatory special assessment fee of $100. Stewart timely appealed.

## I.

### Law and Analysis

---

[2] Garney turned on the page system shortly after stopping Stewart and Watson. The entire audio and video recording of the stop which begins with Stewart already outside of his vehicle was admitted into evidence at the trial and was made available for this court's review. The duration of the tape is approximately one hour.

4

The government concedes that Stewart did not himself possess the crack cocaine, constructively or otherwise. Instead, the government seeks to support Stewart's conviction on a theory that he aided and abetted Watson's crime of possession with intent to distribute cocaine. Aiding and abetting was not charged in the indictment. The theory was argued, however, and submitted to the jury, albeit opaquely. We are, therefore, free to sustain Stewart's conviction, if appropriate, on that ground. ***United States v. Freeze,*** 707 F.2d 132, 136 (5th Cir. 1983) (affirming a conviction for possession with intent to distribute marijuana where defendant was indicted for the substantive offense but an aiding and abetting instruction was submitted to the jury). The sole question presented on appeal is whether the evidence presented at trial was sufficient to convict Stewart of aiding and abetting Watson's possession and Watson's intent to distribute crack cocaine.[3]

In an appeal based on sufficiency of the evidence, the test is "whether the jury could reasonably, logically, and legally infer from the evidence presented that [Stewart] was guilty of violating the statute beyond a reasonable doubt." ***United States v. Smith,*** 546 F.2d 1275, 1283 (5th Cir. 1977) (quoting ***United States v.***

---

[3] "[I]n a prosecution for aiding and abetting possession of cocaine with intent to distribute, there must be evidence connecting the defendant with both aspects of the crime, possession and intent to distribute." ***United States v. Longoria***, 569 F.2d 422, 425 (5th Cir. 1978).

5

*Bright,* 541 F.2d 471, 476 (5th Cir. 1971)).  In making this inquiry, we are mindful of the deferential standard of review that we must apply when reviewing a jury verdict.  We are required to review all of the evidence presented at trial in a light most favorable to the government.  *United States v. Polk,* 56 F.3d 613, 619 (5th Cir. 1995).  Moreover, we must sustain the jury's verdict unless the government failed to meet its burden of proving each and every element of the offense beyond a reasonable doubt.  *United States v. Cartwright*, 6 F.3d 294, 299 (5th Cir. 1993).  We are not, however, required to affirm a verdict that is not supported by legally sufficient evidence.  *See, e.g.*, *United States v. Williams,* 985 F.2d 749, 756 (5th Cir. 1993); *Longoria,* 569 F.2d at 425; *Smith,* 546 F.2d at 1285 (all reversing aiding and abetting convictions because the evidence was insufficient to support the jury's guilty verdict); *see also* *United States v. Crain,* 33 F.3d 480, 486 (5th Cir. 1994) ("Notwithstanding the inferences we must draw in favor of a guilty verdict, we reiterate that the burden of proof in this criminal case was on the government.  The government must prove that the defendant was guilty beyond a reasonable doubt, not merely that he could have been guilty.").

The aiding and abetting statute provides in pertinent part: "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."  18 U.S.C. § 2.  To sustain a

6

conviction for aiding and abetting, the government must show that the underlying offense occurred. *See United States v. Pedroza,* 78 F.3d 179, 183 (5th Cir. 1996). The government must also demonstrate "that the defendant associated with [the] criminal venture, purposefully participated in the criminal venture, and sought by his or her actions to make the venture succeed." *Polk,* 56 F.3d at 620. "To associate with the criminal venture means that the defendant shared in the criminal intent of the principal." *United States v. Jaramillo,* 42 F.3d 920, 923 (5th Cir. 1995) "To participate in the criminal activity means that the defendant acted in some affirmative manner designed to aid the venture." *Id*.

There is no dispute about whether Watson committed the underlying offense. Rather, Stewart maintains that the record is insufficient to establish that Stewart knowingly and purposefully participated in Watson's offense. Again, to sustain Stewart's conviction for aiding and abetting, the evidence must demonstrate (1) that Stewart knowingly associated with Watson's criminal venture, (2) that he purposefully participated in the criminal venture, and (3) that he sought by his actions to make the criminal venture succeed. *Id*.

## II.

### Evidence at Trial

The association element of aiding and abetting requires that

7

the defendant share the criminal intent of the principal. *Id*. This element cannot be established if the defendant has no knowledge of the principal's criminal venture. *See **United States v. Ortiz-Loya,*** 777 F.2d 973 (5th Cir. 1985) (reversing a conviction for aiding and abetting attempted unlawful exportation of firearms where there was no evidence that defendant had knowledge of his buyer's intention to export the firearms to Mexico); ***United States v. Belt,*** 574 F.2d 1234 (5th Cir. 1978) (reversing a conviction for aiding and abetting conversion of union funds where there was no evidence that defendant had knowledge that his arrangement for cashing checks was being used for the purpose of diverting funds from the union). We find that the evidence is insufficient to establish that Stewart had any knowledge of Watson's criminal venture and therefore find that the association element of the aiding and abetting offense was not proven.

The government offered the following circumstantial evidence of Stewart's knowledge. Stewart accompanied Watson on a trip from Waco to Houston in a car that belonged to Watson's girlfriend. During that trip, the car was stopped and Stewart acted "fidgety" or nervous. Watson was discovered to have been carrying drugs in his own underwear. Two weapons were found in the car. Once they were arrested, Stewart and Watson engaged in an ambiguous, and

potentially inculpatory, conversation in the back of a patrol car.[4]
We will address each item of circumstantial evidence below.

Though Stewart's presence in the vehicle is a factor that, along with other evidence may be relied upon to find that he aided and abetted Watson, mere presence at the crime scene and close association with the principal are insufficient standing alone to support a conviction for aiding and abetting another's crime. *Polk,* 56 F.3d at 620. Moreover, Stewart's presence in the vehicle and association with Watson are insufficient to support a reasonable inference that Stewart had any knowledge of the drugs. *See United States v. Menesses,* 962 F.2d 420, 427 (5th Cir. 1992) (holding evidence that defendant drove a vehicle and followed a truck containing cocaine was insufficient to prove that he had knowledge of the drug transaction); *United States v. Gomez,* 776 F.2d 542, 549 (5th Cir. 1985) (holding evidence that defendant chauffeured members of a drug conspiracy and spent time in a hotel room with them was insufficient to prove that he had knowledge of drugs in the truck he followed despite the fact that officers found a small amount of marijuana in his passenger's boot); *United States*

---

[4] Stewart filed a motion to suppress the recording in the district court, but inexplicably withdrew that motion at trial. For that reason, the admissibility of the tape, which is an open question in this Circuit, is not before us. *See United States v. McKinnon,* 985 F.2d 525 (11th Cir. 1993); *United States v. Clark,* 22 F.3d 799 (8th Cir. 1994) (both involving pre-arrest recorded conversations but extending those holdings to post-arrest recorded conversations in dicta).

*v. Littrell*, 574 F.2d 828, 835 (5th Cir. 1978) (holding evidence that the defendant drove a car to a shop, parked it, and went into a bar while drugs were removed and sold was insufficient to prove that he had knowledge the vehicle contained drugs).

Next, the government offers evidence from Garney that Stewart appeared nervous during the traffic stop. Having reviewed the videotape recording of the entire stop, we find no support for the proposition that Stewart was unusually nervous or fidgety. Stewart was no more nervous during the stop than any other citizen who has been stopped on the side of the road by a police officer and required to stand outside his vehicle for more than forty minutes. To the contrary, Stewart was polite and cooperative in his responses. He provided his correct driver's license number and volunteered the possibility that it had been suspended. Stewart answered all of Garney's inquiries concerning where he and Watson were from and why they had been in Houston.

The government contends that Stewart hesitated before giving consent to search the vehicle, and then shrugged non-committally. The government cites this conduct as evidence of guilty knowledge. We have seen the tape. Once again, there is nothing surprising about Stewart's conduct. The car was not his. He may have been unsure about whether he had authority to consent to the search. The hesitation, if any at all, was fleeting and was quickly followed by Stewart's shrug and vocalizations which plainly

10

communicated that he did not know how to answer the question. We find no legal significance in Stewart's conduct during the stop.

The government also relies upon the presence of the two weapons in Watson's girlfriend's car. There is no evidence tying Stewart to the guns. The vehicle did not belong to Stewart, and the weapons were not in plain view. In fact, the weapons were so well concealed that officers spent more than twenty minutes searching the car before the weapons were discovered. The area beneath the seat was checked several times before Garney and the barrage of backup officers were finally able to retrieve the weapons. Neither of the weapons had Stewart's fingerprints.[5] Even viewing the videotape of the traffic stop in the light most favorable to the government, we are unpersuaded that Stewart's presence, his demeanor during the stop, and the presence of weapons is any more than a scintilla of evidence that Stewart knowingly and purposefully participated in Watson's possession of cocaine or in Watson's intent to distribute the cocaine.

In the government's view, the most significant evidence in this case comes from the ambiguous conversation between Stewart and Watson in the back seat of the patrol car. Indeed, the government's brief suggests they are relying almost exclusively upon the inferences that may be drawn from this eight minute

---

[5]   Stewart's fingerprints were likewise not to be found on the plastic bag containing the crack cocaine which was recovered from Watson's person.

11

excerpt of the one hour recording made by Garney's page system.

Even when viewed in the light most favorable to the government, Watson's comments to Stewart in the back of the patrol car do not establish Stewart's guilt.  The conversation begins with Watson trying to reassure Stewart.[6]  Watson then flagged Garney down and asked what would happen to Stewart.[7]  At this point, Watson assured Garney that Stewart was uninvolved, both with the guns and the cocaine.[8]

_____

[6]  Watson: I tried to get them to let you go, man....I claimed them guns and the woot.  They can't charge you with too much of nothin', man.  I was going to tell you not to (expletive) drive without a license.

[7]  Watson: Question!
Garney: Question?
Watson: Yeah, uh, what's y'all doin' about him?
Garney: He's going to jail.
Watson: For what?
Garney: For that gun and that dope.
Watson: What am I going for?
Garney: Same thing.
Watson: But I already told you, it--everything--were mine.
Garney: Well, we'll talk.
Watson: Okay.
Garney: We know more than you think, okay?
Watson: I'm serious.
Garney: (inaudible)...both involved.
Watson: He's not involved!
Garney: We'll talk about it, okay?

[8]  We note that Watson's disclaimer of Stewart's involvement is consistent with comments made independently by Watson and Stewart before they were placed in the patrol car.  For example, Watson said to Garney, "But I already told you, it -- everything -- were mine," an indication that he had made the same statement earlier. Moreover, upon being arrested, Stewart seemed confused and appeared not to understand the reason for his arrest. He, in fact, asked Garney why he was being arrested.

Once Stewart and Watson were alone, Stewart can be heard muttering a string of strong expletives under his breath.[9] Watson responded by rambling on at length about the fact that he had warned Stewart not to speed through Madisonville, and was going to warn him not to drive with a suspended license.[10] The government tenders those comments as evidence of Stewart's guilty knowledge, asking us to draw the inference that Stewart knew he had to be

[9] At trial, the government introduced a transcript of the conversation that had been prepared by Officer Garney. We note that the transcript does not reflect Stewart's string of expletives. The government relies heavily on the transcript, which was presented to the jury together with the videotape recording. In addition to the omission of Stewart's expletives, there are a number of other identifiable inconsistencies between the transcript and the videotape recording. Those inconsistencies may be explained by the fact that Watson was apparently much closer to the microphone. Without regard to what caused inconsistencies in the transcript, the district court expressly instructed the jury that the transcript was not evidence, and that only the videotape recording should be relied upon for the content of the conversation. Despite that limiting instruction, the presence of the transcript, which contained several material errors, may have either encouraged the jury's reliance or resulted in confusion about the content of the conversation.

[10] Watson: I told you not to speed through Madisonville, man. I told you, gosh (expletive), I told you not to speed through Madisonville. (expletive), man. Well, I told you not to speed through Madisonville, man. I kept telling you; you did it anyway. I told you, man, I told you, man. (expletive).
. . .
Watson: All I ask you to do is ride up there on some music, that's it, but I was telling you, Raymond, (expletive), I was telling you, don't speed through Madisonville, and you did it anyway. (expletive) man! I told you, Raymond, I told you. (expletive).

[Similar comments were made by Watson to Stewart in two more exchanges during the eight minute conversation.]

13

careful driving through Madisonville. From that inference, which we agree is reasonable, the government asks us to draw the additional inference that Stewart knew he had to be careful *because* Watson was carrying cocaine. The evidence will support no such inference. Even assuming Stewart knew Watson did not want him to speed, there is no evidence whatsoever from Watson's statements that indicates Stewart knew why Watson asked him to be cautious. We do not find the fact that Watson told Stewart not to speed, or the tone of Watson's lamentations that he had issued such a warning to be probative evidence that Stewart knew Watson was carrying cocaine with the intent to distribute.

Finally, the government identifies certain ambiguous statements made on the recording which it argues support an inference that Watson was "coaching" Stewart to let Watson take the blame. From that coaching, the government invites us to draw the additional inference that Stewart had guilty knowledge of Watson's offense. While the two men were in the back of the patrol car, Watson twice told Stewart: "You don't know nothin'." On the second occasion, Watson supplemented that comment with the observation "It's all on me."[11] Taken out of context, Watson's comments can be

_____

[11] On the second occasion, Watson also prefaces his "you don't know nothin'" comment with the words "right now." The government relies on this phrase as support for their coaching scenario. The transcript relied upon by the government and prepared by Garney chooses to punctuate Watson's statement such that the phrase "right now" modifies the phrase "you don't know nothin'." In the recording, however, it appears just as likely that "right now" was intended to modify the preceding phrase, "I ain't talkin' on

14

construed as coaching. When viewed in context, however, these statements appear equally likely to be reassurances by Watson in an attempt to curtail Stewart's temper.

We are unpersuaded by the government's position that Stewart's knowledge can be reasonably inferred from the recorded conversation. As an initial matter, the eight minute excerpt relied upon by the government is comprised almost exclusively of Watson's unsolicited and unanswered comments about his own situation. Stewart makes only a very few audible comments, none of which are facially inculpatory. Most of Stewart's comments relate to why Stewart believed the car had been stopped. Stewart corrected Watson by saying that they had been stopped for failure to use a turn signal, rather than for speeding. The only comments identified as even potentially inculpatory by the government are clearly responses to other statements made by Watson. For example, when Watson lamented that he might be required to turn government informer, Stewart asked Watson what he intended to do.[12]

Watson refers only to himself in his incriminating statements and never implicates Stewart.[13] Stewart's own statements in this

---

coochie man," rather than the subsequent phrase. In these circumstances, it is simply impossible to infer anything from Watson's use of the phrase "right now."

[12] Stewart's actual response is garbled on the tape, but was either "Whatcha wanna do?" or "Whatcha gonna do?"

[13] Watson: Oh, my god. I'm so busted, disgusted. I got a major dope case, two guns--that's aggravated. Raymond, I told you not to speed through Madisonville, baby.

15

covertly recorded and purportedly candid conversation are either exculpatory, such as when he proclaims "I didn't do a (expletive) thing!", or assume only Watson's culpability, such as when he asks Watson, "Whatcha wanna do?"

The government's arguments require us to pile inference upon inference. *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996) ("[A] verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference."). Stewart's conviction cannot rest on nothing more than a few facially neutral comments. Even when viewed in a light most favorable to the government, neither those few statements made by Stewart nor Watson's meanderings are sufficient to establish Stewart's knowledge beyond a reasonable doubt. Though "it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt," *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1992) (en banc), we must reverse the conviction "if the evidence construed in favor of the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged." *Jaramillo,* 42 F.3d at 923. In this case, neither the taped conversation nor any

---

...
  Watson: This is it for me in the dope game, man, I know it is. This is it. I don't really know how I am going to get out of it. I'm not going to lie to you. (expletive) That's it for me, man. I'm through.

of the other circumstantial evidence is sufficient to establish that Stewart knowingly and purposefully participated in Watson's possession and Watson's intent to distribute crack cocaine. Stewart's conviction is, therefore, REVERSED.