**UNITED STATES of America,
Plaintiff–Appellee**

**v.**

**Hector Ivan AGUILAR, also known
as Hector Ivan Aguilar, Jr.,
Defendant–Appellant.**

**No. 10–50817.**

United States Court of Appeals,
Fifth Circuit.

Sept. 7, 2011.

Joseph H. Gay, Jr., Assistant U.S. Attorney, U.S. Attorney's Office, San Antonio, TX, for Plaintiff–Appellee.

John Thomas Anderson, Esq., Anderson Law Office, Alpine, TX, for Defendant–Appellant.

Before JONES, Chief Judge, STEWART, and SOUTHWICK, Circuit Judges.

## PER CURIAM: *

Hector Ivan Aguilar appeals his conviction by a jury of one count of possessing with intent to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. § 841 and with aiding and abetting in violation of 18 U.S.C. § 2. On appeal, Aguilar argues that the evidence presented at trial was insufficient to support his conviction. Finding the evidence sufficient to support the jury's verdict, we AFFIRM.

## I.

On February 7, 2010, Border Patrol agents found footprints near Valentine, Texas, in an area known for drug trafficking and human smuggling. The agents followed the footprints and discovered and seized backpacks containing 359.8 pounds, or 161.9 kilograms, of marijuana.[1] The agents also apprehended seven undocumented individuals near where the backpacks were located. One of those individuals, Gumaro Quinonez–Navarrette, admitted that he and his companions carried the marijuana from Mexico into Texas. Quinonez–Navarrette told the agents that once he and his companions delivered the drugs, they were to be driven back to Mexico.

After his arrest, Quinonez–Navarrette decided to cooperate with the agents. Once they received approval, the agents proceeded to set up a controlled delivery. As part of his cooperation, Quinonez–Navarrette agreed to call his contact, "El Veneno," who gave Quinonez–Navarrette another number to call. Once the agents were ready for the controlled delivery, Quinonez–Navarrette called this second number, which is associated with a cell phone in the possession of Eric Pinon.[2] During the course of four or five phone conversations that were initiated by Pinon, Quinonez–Navarrette was informed that he and his companions would be met by a white car and a black pickup truck whose drivers would honk when they arrived.

Quinonez–Navarrette placed a plastic jug of water on the road as a marker for the drivers. At approximately 4:00 a.m. on February 8, 2010, two vehicles approached from Van Horn, Texas, which is west of the rendezvous point. A black, four-door pickup truck slowed and made a u-turn so that it was parked facing west. A white, five-passenger Cadillac parked on the opposite shoulder, facing east. The vehicles honked, and the agents, who had hid in the brush north of the plastic jug, began walking towards the truck. The driver of the truck, Jesse Soto, exited the truck and told the agents to "hurry up" and "throw the bags in the back." At the same time, Pinon, the driver of the Cadillac, began walking in the direction of the truck while talking on his cell phone. According to trial testimony, Pinon said "vamonos" and looked as if he was going to assist in picking up and throwing the bags into the

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1. At trial, an agent testified that this amount would be valued at approximately between $160,000 and $170,000 "at the initial part past the [border] checkpoint."

2. According to one of the agents who listened to the calls between Quinonez–Navarrette and the second number, the person on the other end of the line identified himself as "Eric."

truck. When Pinon saw that the agents were not the backpackers, he fled, but was quickly apprehended. When Soto told the agents to throw the bags in the pickup, the agents arrested him and the passenger in the pickup.

Meanwhile, two other officials secured the Cadillac. The first, agent Jason Tackett, told Aguilar, the passenger of the Cadillac, to show his hands. Aguilar, however, did not respond to this initial request. When Aguilar did not get out of the vehicle after being ordered to do so, Tackett pulled Aguilar out of the car. According to Tackett, Aguilar did not seem surprised, nervous, or scared. Aguilar did not try to "escape, run, or anything." Rather, his attitude was one of "you got us."

Steven Schwartz was also responsible for securing the Cadillac. Schwartz, a Texas Department of Public Safety investigator, saw both drivers exit their vehicles when they stopped at the side of the road. After both vehicles stopped, Schwartz ran up to the front of the Cadillac with his weapon drawn and told Aguilar to show his hands. Schwartz testified that Aguilar looked as though he was trying to slide over into the driver's seat. When Aguilar saw Schwartz's weapon, Aguilar lifted his hands to chest level. Schwartz testified that Aguilar had a "startled" look, but admitted that this look was expected given the presence of his weapon.

As Tackett pulled Aguilar from the car, he saw fried chicken fall to the ground. Schwartz also testified that Aguilar had a sack in his lap-later determined to hold fried chicken from Church's Chicken-before he was pulled out of the car. Tackett found no evidence that anyone had been eating the chicken. Tackett also located two twelve-packs of soft drinks on the passenger side floorboard of the Cadillac, but only one or two cans were missing from one twelve-pack.

At trial, Tackett testified that no stores were open in the area. According to him, the nearest town to the west, Van Horn, was approximately thirty miles away and had a Wendy's and a gas station. The nearest town to the east, Marfa, was approximately sixty miles away. Agent Dominic Zuniga testified that the closest Church's Chicken to Valentine was in either El Paso or Odessa. Because the men did not appear to have gone through either city, the closest Church's Chicken was in Hobbs, New Mexico. Tackett also testified that the chicken and sodas "looked like it was for guys who had been probably walking for days without food."

After Tackett pulled Aguilar out of the Cadillac, Schwartz took Aguilar back to the Border Patrol station, where he was questioned by Schwartz and Zuniga. When Zuniga asked Aguilar what a "boy from Hobbs" was doing in west Texas at 4:00 a.m., Aguilar responded by stating that he was out riding with his friends. During this questioning, Aguilar admitted that he knew the men in the pickup, and informed Schwartz that they were also from Hobbs. Aguilar also stated that he did not know what route they had taken, and that he did not know the purpose of their trip. When asked why he had "$100 worth of chicken" in his lap, Aguilar responded that he did not know. In addition, when asked if he regularly rode around at that hour, Aguilar stated that there was nothing better to do.

At trial, the Government established the above facts and also entered into evidence the following: a stipulation as to the amount of marijuana found; photographs of the vehicles, the backpacks, the fried chicken, and the twelve-packs of soft drinks; a Texas map; online maps predicting the route the men took from Hobbs to Valentine; and a fuel receipt found in the truck. Notably, the fuel receipt was from

a gas station in Van Horn, and was printed approximately thirty minutes before the vehicles arrived at the delivery spot. In addition, Zuniga testified at trial that the most direct route between Hobbs and Valentine was 237 miles. The Government's trial theory was that Aguilar and Pinon would take the backpackers back to Mexico in the Cadillac, and the truck would carry the drugs back to New Mexico.

## II.

### A. Standard of Review

"It is fundamental that we, as an appellate court, owe great deference to a jury verdict." *United States v. Miller*, 146 F.3d 274, 280 (5th Cir.1998) (citing *United States v. Walters*, 87 F.3d 663, 667 (5th Cir.1996)). As a result, " 'a defendant seeking reversal on the basis of insufficient evidence swims upstream.' " *United States v. Holmes*, 406 F.3d 337, 351 (5th Cir.2005) (quoting *United States v. Mulderig*, 120 F.3d 534, 546 (5th Cir.1997)).

When a defendant moves for a judgment of acquittal at the close of the Government's case and does not present any evidence, we conduct a *de novo* review of his claim. *United States v. Frye*, 489 F.3d 201, 207 (5th Cir.2007). Under this standard of review, we must "determine whether ... a rational jury could have found the essential elements of the offense beyond a reasonable doubt. We are concerned only with whether the jury made a rational decision, not with whether its verdict was correct on the issue of guilt or innocence." *United States v. Alarcon*, 261 F.3d 416, 421 (5th Cir.2001) (internal quotation marks and citations omitted).

In making this determination, we review the evidence, both direct and circumstantial, in the light most favorable to the government with all reasonable inferences and credibility choices made in support of

a conviction; if the evidence would permit a rational fact finder to find every element of the offense beyond a reasonable doubt, we must affirm. *United States v. Anderson*, 559 F.3d 348, 353 (5th Cir. 2009); *Miller*, 146 F.3d at 280. If, however, the evidence construed in favor of the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, we must reverse the conviction. *Miller*, 146 F.3d at 280 (quoting *United States v. Dean*, 59 F.3d 1479, 1484 (5th Cir.1995)). When conducting this review, "we apply a rule of reason, knowing that the jury may properly rely on their common sense and evaluate the facts in light of their knowledge and the natural tendencies and inclinations of human beings." *Holmes*, 406 F.3d at 351 (internal quotation marks and citations omitted).

### B. Applicable Law

To establish that a defendant aided and abetted, the Government must prove that the three elements of the substantive offense occurred and that the defendant associated with the criminal venture, purposefully participated in the criminal activity, and sought by his actions to make the venture succeed. *United States v. Jimenez*, 509 F.3d 682, 690 (5th Cir.2007) (citations omitted). "The association element of aiding and abetting requires that the defendant share the criminal intent of the principal. This element cannot be established if the defendant has no knowledge of the principal's criminal venture." *United States v. Stewart*, 145 F.3d 273, 277 (5th Cir.1998). "It is not enough to show that he engaged in otherwise innocent activities that just happened to further the criminal enterprise." *United States v. Peñaloza–Duarte*, 473 F.3d 575, 579 (5th Cir.2006) (citing *United States v. Beckner*, 134 F.3d 714, 718–19 (5th Cir.1998)).

The elements of the substantive offense of possession with intent to distribute are: (1) knowingly (2) possessing marijuana (3) with the intent to distribute it. *United States v. Jimenez*, 509 F.3d 682, 689 (5th Cir.2007) (citation omitted). To establish the requisite knowledge, the Government must prove that "the defendant had knowledge that he was transporting drugs, rather than another form of contraband." *United States v. Mireles*, 471 F.3d 551, 556 (5th Cir.2006).

## C. Discussion

According to Aguilar, his conviction should be reversed because the Government failed to prove that he knew that the purpose of the trip to Valentine was to smuggle marijuana. Given the narrow scope of our review of challenges to the sufficiency of evidence presented at trial, *United States v. Cano–Guel*, 167 F.3d 900, 904 (5th Cir.1999), we conclude that Aguilar has failed to provide a basis to disturb the jury's verdict.

After a review of the record as a whole, we find that the Government presented sufficient evidence at trial for a rational jury to have found that Aguilar knew that the purpose of his trip to Texas was to obtain marijuana. In this case, there is no direct evidence of Aguilar's state of mind. Because there is an absence of direct evidence, we must turn to considering the circumstantial evidence presented at trial. In considering this evidence, we are mindful that "[n]o single piece of circumstantial evidence need be conclusive when considered in isolation[.]" *Cano–Guel*, 167 F.3d at 905 (citing *Miller*, 146 F.3d at 281).

Aguilar's knowledge of the nature of his trip can be reasonably inferred after considering various pieces of circumstantial evidence. First, the long distance driven by the Cadillac, combined with the odd hour at which Pinon and Aguilar were on the road, suggests that Aguilar knew the purpose of his trip. A reasonable jury could have found it implausible that an individual would be a passenger in a car that traveled over 200 miles during the middle of the night and early morning while being oblivious to the purpose of his trip. While, again, there is no direct evidence that Aguilar knew the purpose of his trip, we must recognize that "[j]uries are free to use their common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence." *United States v. Flores–Chapa*, 48 F.3d 156, 161 (5th Cir.1995). Relying on their common sense and experience, a reasonable jury could have determined that the distance driven and the hours at which the Cadillac was on the road supports the inference that Aguilar knew the purpose of his trip to Valentine.

Second, Aguilar's close physical proximity to Pinon also supports the conclusion that Aguilar was not in the dark about the reason for his trip to Texas. At trial, it was established that Aguilar was in the passenger seat of the Cadillac driven by Pinon. Evidence presented by the Government also indicated that Pinon, the contact person for the delivery, initiated four to five calls to Quinonez–Navarrette in which the details of the delivery were ironed out.[3] The significance of this fact is enhanced by the testimony of an agent who stated that there was an absence of background noise on Pinon's side of these conversations. While mere association

---

**3.** We note, however, that there was no evidence presented that marijuana was discussed during these phone calls.

with participants in criminal activity is not enough to support a conviction, *United States v. Sultan*, 115 F.3d 321, 328 (5th Cir.1997), a reasonable jury considering Aguilar's proximity to one side of a conversation discussing the delivery could have properly used this fact to support the conclusion that Aguilar was aware of the purpose of his late-night trip.

Third, Aguilar's implausible answers to questions posed by investigators also buttress the jury's conclusion regarding his state of mind. In the past, we have recognized that implausible explanations can "reasonably be relied upon as circumstantial evidence of guilty knowledge." *Cano–Guel*, 167 F.3d at 905 (citations omitted). In this case, when Aguilar was asked by investigators what he was doing on the road that night, he responded by stating that he was out riding around with his friends. Given the hour and distance from his hometown, his response to this question is implausible. Thus, it could have properly been relied upon by the jury in finding that Aguilar was not oblivious to the nature of his trip.

Fourth, the quantity and value of the marijuana involved also supports the jury's verdict. "[A] jury may properly infer a defendant's guilty knowledge based on the quantity of drugs, as long as other evidence supports the inference." *United States v. Garcia–Flores*, 246 F.3d 451, 455 (5th Cir.2001); *see United States v. Villarreal*, 324 F.3d 319, 324 (5th Cir.2003) ("One example of circumstantial evidence which may be probative of knowledge is the value of the drug being transported."). In this case, the jury could have properly considered the quantity and border value of the marijuana in determining that Aguilar was not an unwitting participant in a plan to smuggle drugs into the United States. In doing so, they could have reasonably inferred that Pinon, the individual who was coordinating the delivery of approximately 360 pounds of marijuana, was unlikely to have left his passenger unaware of the purpose of their 200 mile nocturnal journey. Put simply, the quantity and border value of the marijuana could have been used by the jurors to draw an inference regarding Aguilar's state of mind. *Cf. Garcia–Flores*, 246 F.3d at 455 (finding that the defendant's control over a vehicle containing 343 pounds of marijuana could be used by a jury to infer his guilty knowledge).

Taken together, these pieces of circumstantial evidence, combined with the rest of the evidence presented at trial, convince us that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. While, as Aguilar contends, some of the circumstantial evidence relied upon by the Government could also point to other forms of illegal activity, this in itself does not unsettle our conclusion. As we have stated before, " 'evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.' " *United States v. Dadi*, 235 F.3d 945, 950 (5th Cir.2000) (quoting *United States v. Bermea*, 30 F.3d 1539, 1551 (5th Cir.1994)). In deliberating, a jury is free to choose among reasonable constructions of the evidence. *Id.* Although they are not the constructions Aguilar would have preferred, the inferences drawn by the jury were reasonable. Accordingly, we will not disturb their verdict.

### III.

We conclude that the circumstantial evidence in this case is sufficient to support the jury's verdict. We therefore AFFIRM Aguilar's conviction.